1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

TIMELINE, INC.,

               Plaintiff,

   v.

PROCLARITY CORPORATION, et al.,

            Defendants.

No. C05-1013JLR

ORDER

## I.  INTRODUCTION

     This matter comes before the court on the parties' request for construction of ten disputed claim terms in this patent infringement action.  The court has reviewed the parties' briefing and supporting materials and held a Markman hearing on June 1, 2006.  This order memorializes the court's claim construction for the ten disputed terms.

## II.  BACKGROUND

     Plaintiff Timeline, Inc. has brought this suit against Defendant ProClarity Corporation and its current and former directors, alleging infringement of five patents.  The Timeline patents at issue in this case are patent numbers 5,802,511 (the "'511 patent"), 6,023,694 (the "'694 patent"), 6,026,392 (the "'392 patent"), 6,625,617 (the "'617 patent"), and 6,631,382 (the "'382 patent").  The '511 patent application was filed on February 1, 1996 and the patent issued on September 1, 1998.  The four other patents were issued between February 2000 and October 2003.  Timeline asserts and

ORDER - 1

1   ProClarity does not dispute that the five patents are closely related and that the specification portions

2   of the patents are largely similar.

3       The patents describe an invention that is designed to facilitate the retrieval and coordination of

4   information that is stored in various types of databases or other data sources.  The '511 patent

5   describes the invention as "a computer-implemented system which is able to retrieve information

6   stored in one or more of a number of different sources and which may be in any of a number of

7   different formats and/or provide reports and analysis based on the information."  '511 patent, Col.

8   1:11-15.  The '511 patent also describes the invention as "a system which achieves access to stored

9   information, e.g., for accessing information or for achieving coordination and/or combination of

10  information in two different information storage systems."  Id. Col. 2:66 - 3:2.

11      Claim terms from the '511 patent have been construed in at least one other case previously

12  filed in this court.  See Timeline, Inc. v. Sagent Tech., Inc., C99-414C, slip op. (W.D. Wash. Feb. 23,

13  2000) (Coughenour, J.).

### III.  ANALYSIS

15      In Markman v. Westview Instruments, Inc., 517 U.S. 370, 372 (1996), the Supreme Court

16  placed sole responsibility for construing patent claims on the court.  Subsequent authority has

17  established that the court construes claims purely as a matter of law.  Cybor Corp. v. FAS Tech., Inc.,

18  138 F.3d 1448, 1456 (Fed. Cir. 1998) (applying de novo review to all claim construction issues, even

19  "allegedly fact-based questions").  Executing the Markman mandate requires a court to interpret

20  claims after giving the appropriate level of consideration to various sources of evidence.

21      Intrinsic evidence, which includes the patent and its prosecution history, is the primary source

22  from which to derive a term's meaning.  Phillips v. AWH Corp., 415 F.3d 1303, 1314 (Fed. Cir. 2005)

23  (en banc).  A patent is composed of three parts: (1) a "written description," which includes an often

24  lengthy exposition of the background of the invention, at least one embodiment of the invention, and

25  other written material that assists in understanding how to practice the invention; (2) (in most cases) a

ORDER - 2

set of drawings that illustrates portions of the written description; and (3) the claims, which delimit the scope of the invention. General Foods Corp. v. Studiengesellschaft Kohle mbH, 972 F.2d 1272, 1274 (Fed. Cir. 1992). Together, these three components make up the patent's "specification."[1] Atmel Corp. v. Information Storage Devices, Inc., 198 F.3d 1374, 1384 (Fed. Cir. 1999); 35 U.S.C. § 112.

The prosecution history exists independently of the patent. It consists of the inventor's application to the Patent and Trademark Office (PTO) and all correspondence between the PTO and the inventor documenting the invention's progress from patent application to issued patent. Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996).

In its review of intrinsic evidence, the court begins with the language of both the asserted claims and other claims in the patent. Phillips, 415 F.3d at 1314; Biagro Western Sales, Inc. v. Grow More, Inc., 423 F.3d 1296, 1302 (Fed. Cir. 2005) ("It is elementary that claim construction begins with, and remains focused on, the language of the claims."). The court's task is to determine the "ordinary and customary meaning" of the terms of a claim through the eyes of a person of ordinary skill in the art on the filing date of the patent. Phillips, 415 F.3d at 1313. Sometimes, the ordinary meaning is "readily apparent even to lay judges," in which case claim construction "involves little more than the application of the widely accepted meaning of commonly understood words." Id. at 1314.

The court must read claim language, however, in light of the remainder of the specification. Id. at 1316 ("[T]he specification necessarily informs the proper construction of the claims."). The specification acts as a "concordance" for claim terms, and is thus the best source beyond claim language for understanding claim terms. Id. at 1315. The inventor is free to use the specification to define claim terms as he or she wishes, and the court must defer to an inventor's definition, even if it is merely implicit in the specification. Id. at 1316 ("The inventor's lexicography governs."), 1320-21

---

[1] Although 35 U.S.C. § 112 includes the claims as part of a patent's specification, many courts and practitioners use the term "specification" to refer to all portions of a patent except the claims. In most cases, the context of the discussion reveals what portion of the specification is at issue.

1   (noting that a court cannot ignore implicit definitions).  The court should "rely heavily" on the

2   specification in interpreting claim terms.  Id. at 1317.  In doing so, however, the court must walk a

3   tightrope between properly construing the claims in light of the written description and the "cardinal

4   sin" of improperly importing limitations from the written description into the claims.  Sci Med Life

5   Sys., Inc. v. Advanced Cardiovascular Sys., Inc., 242 F.3d 1337, 1340 (Fed. Cir. 2001); Phillips, 415

6   F.3d at 1323.

7       Although a patent's prosecution history is also intrinsic evidence, it is "less useful for claim

8   construction purposes" because it usually "lacks the clarity of the specification."  Phillips, 415 F.3d at

9   1317.  The prosecution history is useful, however, in determining when an inventor has disavowed

10   certain interpretations of his or her claim language.  Id.

11      Finally, the court can consider extrinsic evidence, "including expert and inventor testimony,

12   dictionaries, and learned treatises."  Id.  Extrinsic evidence is usually "less reliable than the patent and

13   its prosecution history" as a source for claim interpretation.  Id. at 1318.  The court thus need not

14   admit extrinsic evidence, but may do so in its discretion if intrinsic evidence does not disclose the

15   meaning of a claim term.  Id. at 1319; Vitronics, 90 F.3d at 1583 ("[W]here the public record

16   unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is

17   improper.").

18      In this case, both sides have cited expert testimony, inventor testimony, and various dictionary

19   definitions to support their proposed constructions.  For the most part, the intrinsic evidence is

20   sufficient to either confirm that the inventor used the term in its ordinary sense or to reveal any

21   departure from the ordinary meaning that the inventor intended.  As a result, the court discusses

22   dictionary definitions only where necessary and declines to rely on expert testimony or inventor

23   testimony in construing the terms.

24      With this general framework in mind, the court turns to the claim terms in dispute.  The court

25   addresses the terms in the order that they were presented at the claim construction hearing.  In its

1   analysis, the court places primary emphasis on the '511 patent because it was the first patent issued

2   and its claims include most of the disputed terms.

3   **A.      Driver**

4          The term "driver" appears in all claims for the '511, '392, and '694 patents.  It also is used in

5   claims 1 and 2 of the '382 patent, as well as claims 1-3, 5, 9-17, and 25-26 of the '617 patent.

6          The claims indicate that a driver may perform a variety of functions.  These functions include

7   accessing and storing information.  See '511 patent, claims 1 and 2.  Claim 10 of the '511 patent lists

8   other functions that a driver may perform, including:

9          *      selecting directories where data sources are located;

10          *      searching directories for data files;

11          *      displaying data to be input or updated;

12          *      loading general information and data definitions from data sources;

13          *      creating database tables configured for storing information from data sources;

14          *      saving general information and data definitions from data sources;

15          *      loading data definitions codes, "rollup information," and data into a database.

16   See also '511 patent, Col. 10:47-51 ("Each driver includes a plurality of defined processes or functions

17   901 through 909.  Each function may include computer program instructions 912, e.g., to implement

18   and carry out one or more of the steps described below and depicted in FIG. 10.").  The '511 patent

19   specification also notes (at least in the context of one embodiment) that the drivers "are processes

20   having multiple functions for analyzing and accessing" different types of source data.  '511 Pat., Col.

21   9:31-32.

22          Timeline's proposed construction of the term "driver" is both simple and broad:  "Computer

23   software which performs functions such as accessing, processing, or storing data."  ProClarity's

24   proposed construction is considerably more detailed:  "A self-contained set of multiple functions,

25   distinguishable from and connected to an application level program, performed by a computer

1   including the ability to perform analysis and intelligent interrogation of a data source and which can

2   identify what is required to store a standard form of the data source, e.g. for reporting and analysis."

3        Timeline's proposed construction, although quite broad, is not inconsistent with the use of the

4   term "driver" in the claims themselves.  The claims plainly indicate that a driver may perform a variety

5   of functions, including but not limited to accessing and storing data.[2]

6        ProClarity's more narrow construction of "driver" includes a number of limitations.  For

7   example, ProClarity asserts that a driver must be "self-contained."[3]   ProClarity does not cite any

8   language from the specification that uses the term "self-contained" in connection with the term

9   "driver."  However, ProClarity argues:

10       The patent describes drivers as "function modules 804a through 804d" and clarifies that each
         driver is a "different module[]."  '511 Pat., 12:34, 53-54.  A module, in the context of
11       software, is a self-contained unit.  Thus, the driver of the patent must be "self-contained."

12   Def.'s Opening Brief at 20.  In response, Timeline argues that this language from the '511 patent

13   simply describes a preferred embodiment in which the drivers are modular.  Timeline notes that a

14   characteristic described in a preferred embodiment cannot be read as a claim limitation.  See, e.g.,

15   Laitram Corp. v. Cambridge Wire Cloth Co., 863 F.2d 855, 865 (Fed. Cir. 2002) ("References to a

16   preferred embodiment, such as those often present in a specification, are not claim limitations.")

17   Timeline also points out that the '511 patent specification expressly states:

18

19       [2] Timeline also notes that a computer dictionary from 1995 defines the term "database driver"

20   as "a software routine that accesses a database.  It allows an application or compiler to access a
     particular database format."  The Computer Glossary (7th ed. 1995).  However, the claims use the

21   term "driver," not the term "database driver."  In addition, the dictionary definition offered by
     Timeline only indicates that a database driver "accesses" a database.  It makes no mention of "storing"

22   or "processing" data, much less the other functions that the claims indicate that a driver may perform.
     As a result, the dictionary definition offered by Timeline does not lend significant support to its

23   proposed construction.

24       [3] ProClarity also suggests that a driver must be "distinguishable from and connected to the
     application level program."  However, ProClarity offers only a cursory argument in support of this

25   limitation in its opening brief and does not explicit address this limitation in its rebuttal brief.

> Although in the above description, the various drivers 804 can be provided as separate DLL [dynamic link library] files and are dynamic in the sense that as many as desired can be added simply by storing additional DLL files in the proper directory, it would also be possible to make an operable version of the invention in which the function performed by the function modules are provided as portions of or subroutines called by the main procedure 802 rather than being separately stored modules.

'511 patent, Col. 19:28-32.

ProClarity also argues that a driver must have the ability to perform "intelligent interrogation" of a data source. ProClarity bases this argument on language from the '511 patent specification, which states:

> Preferably, loading of the data definition includes interrogation of the data to obtain information. . . . .  The interrogation of the data in the "load data definition" step is intelligent interrogation in the sense that it can conform to virtually any data source and identify what is required to store a standard form of the data source, e.g. for reporting and analysis.

'511 patent, Col. 14:23-34. As before, Timeline argues that this language describes a preferred embodiment of the '511 patent and cannot be construed as a claim limitation.

The court agrees that ProClarity's proposed construction would improperly limit the scope of the term "driver" based on preferred embodiments described in the specification. The claims themselves do not include the limitations that a driver must be "self-contained" or must perform "intelligent interrogation."

However, Timeline's proposed construction is also not ideal. Timeline's proposed construction is not only quite broad, but also differs somewhat from a proposed construction that Timeline advanced in prior litigation in this court involving the '511 patent. In the Timeline v. Sagent case, the court observed that "[t]he parties agree that drivers are 'processes performed by computer software having multiple functions for analyzing and processing data.'" See Ex. A to Pl.'s Opening Brief at 3. Here, Timeline proposes that a driver performs functions "such as accessing, processing, and storing data," but does not include "analyzing" data.

At the same time, it is difficult to construe the term "driver" with great precision, given the variety of functions that a driver may perform. For example, in claim 1 of the '511 patent, the driver is

ORDER - 7

used to "access" information.  In claim 2, the driver is used to "store" information.  Claim 10 lists multiple other functions that a driver may perform.  The specification also indicates that in at least some embodiments, a driver "analyzes" data.  As a result, a broad construction of the term may be necessary in order to ensure that the meaning of the term is the same in all claims in which it appears.  See Nazomi Comm'ns, Inc. v. Arm Holdings, PLC, 403 F.3d 1364, 1370 (Fed. Cir. 2005) (noting that claim term that appears in more than one claim must be construed the same in each).

Therefore, the court construes the term "driver" to mean "computer software which performs functions."  The functions performed by a driver may include accessing, storing, and analyzing data, as well as selecting and searching directories, displaying data, loading general information and data definitions, creating database tables, saving general information and data definitions, and loading data definitions codes, rollup information and data.

**B.    "Data Source"**

The term "data source" appears in all claims for all five patents.  In general, the term is used in the claims to describe the source from which data or information is accessed.  For example, claim 1 of the '511 patent describes a method of accessing "data" stored in "data sources," while claim 2 describes using a driver to store "information" from a "data source."

Timeline's proposed construction of "data source" is "a collection of computer readable information such as a data file," including "a flat file, a hierarchical database, a relational database, a spreadsheet, and the like."  ProClarity's proposed construction is virtually identical.  The key difference is that Timeline's proposed construction is "collection of computer readable *information*," while ProClarity proposes a "collection of computer readable *data*."

Timeline supports its proposed construction by arguing that the patent specification defines "data source" to include "information."  For example, the '511 patent specification states:

The *source data* 806A through 806d depicted in FIG. 8 may, in general, be any computer readable *information* source.  Examples include flat file source data, hierarchical databases, relational databases, spreadsheets, and the like.

'511 patent, Col. 9:49-51 (emphasis added); <u>see also</u> '694 Patent, Col. 9:56-59 (same).  Timeline also notes that the patent specifications frequently use the words "data" and "information" interchangeably, pointing to multiple examples of such usage.  For example, Figure 8 in the '511 patent includes a drawing in which items 806a through 806d are labeled as "information sources."  However, the specification refers to the "information sources" in the drawing as "data sources."  '511 patent, Col. 9:53-58.  Considering this example and the numerous other examples noted by Timeline, it is apparent that the inventor did not draw a sharp distinction between the terms "data" and "information" in the patents.

Because the patents often use the terms "information" and "data" interchangeably, the meaning of the term "data source" is likely to be the same regardless of whether it is construed as a collection of computer readable "information" or "data."  However, the court regards Timeline's proposed construction as more consistent with the implied definition of the term in the '511 patent specification.  <u>See</u> '511 patent, Col. 9:49-51 (indicating that "source data" may, in general, be any computer readable information source).

Therefore, the court construes "data source" to mean "a collection of computer readable information such as a data file."  A data source may be a flat file, a hierarchical database, a relational database, a spreadsheet, and the like.

**C.    "Information"**

The term "information" appears in all claims for all patents.  The term is used in somewhat different contexts.  For example, claim 1 of the '511 patent describes using a driver to obtain "first information" about the data structure of a data source by accessing "content of information" stored in a data source, while claim 6 describes using a driver to store "at least some information" from data sources into a database.

1    Timeline's proposed construction of the term is "facts contained in or describing some or all of

2    a data source."  ProClarity's proposed construction is "interpretation of data when seen in context so

3    as to convey meaning."

4    Timeline's proposed construction of "information" is consistent with the use of the term in the

5    patents and is broad enough to accommodate the different contexts in which the term is used.  When

6    the term is used to describe obtaining "first information" about the data structure of a data source, the

7    ordinary meaning of the term would be obtaining facts that describe a data source.  When the term is

8    used to describe storing at least some "information" from data sources into a database, the term must

9    be read to include facts contained in a data source.

10    To be sure, construing "information" to include "facts contained in . . . a data source" would

11    effectively give the term a meaning that is synonymous with the term "data."  However, as discussed

12    above, the terms "information" and "data" are often used interchangeably in the patents.  In addition,

13    Timeline points to dictionary definitions that define the terms "information" and "data" as synonyms or

14    as interchangeable words.  See, e.g., Computer Desktop Encyclopedia (1981-2005) ("Information is

15    the summarization of data.  Technically, data are raw facts and figures that are processed into

16    information, such as summaries and totals.  But since information can also be the raw data for the next

17    job or person, the two terms cannot be precisely defined and both are used interchangeably");

18    Webster's New Universal Unabridged Dictionary (1996) (listing "data" and "facts" as synonyms of

19    "information").

20    By contrast, ProClarity's proposed construction – "interpretation of data when seen in context

21    so as to convey meaning" – is strained and unduly narrow.  This proposed construction would not

22    accurately reflect the meaning of "information" as it is used throughout the patents, such as when it is

23    used to describe information stored in a data source.  ProClarity argues that because Timeline chose to

24    use two different terms ("information" and "data") in its claims, a different meaning must be ascribed

25    to each term.  See CAE Screenplates, Inc. v. Heinrich Fiedler GMBH & Co., 224 F.3d 1308, 1317

1   (Fed. Cir. 2000) ("In the absence of any evidence to the contrary, we must presume that the use of

2   these different terms in the claims connotes different meanings."). However, two different terms may

3   be construed in the same manner when they are used interchangeably by the patentee. See, e.g., Tate

4   Access Floors v. Maxcess Techs., 222 F.3d 958, 968 (Fed. Cir. 2000). As discussed earlier, there is

5   ample evidence that the term "information" was often used interchangeably with "data" in the patents.

6          Therefore, the court construes the term "information" to mean "facts contained in or

7   describing some or all of a data source."

8   **D.      "Content of Information"**

9          This term appears in all claims of the '511, '382, and '392 patents, as well as claims 11-26 of

10  the '617 patent and claims 19-23 of the '694 patent. In each claim where the term "content of

11  information" appears, the term is used in the context of obtaining information about the data structure

12  of a data source by "automatically accessing *content of information* stored" in the data source. See,

13  e.g., '511 patent, claim 1 (emphasis added).

14         Timeline's proposed construction of "content of information" is "information in a data source

15  such as data values, information about structure or other information." ProClarity's proposed

16  construction is "value and type of data."

17         Timeline argues that ProClarity's proposed construction is too narrow because it limits

18  "content of information" to two specific categories[4] of data (data value and data type), and would not

19  include information about data structure. Timeline maintains that "[b]ecause every claim in which the

20  phrase 'content of information' appears in the patents requires that information about data structure be

21  obtained by accessing the 'content of information stored in [first] data source,' 'content of

22  information' must include 'information about data structure.'" Pl.'s Opening Brief at 7. Timeline

23  points to language in the '694 patent specification which states that "a procedure is first done in which

24  ───────────────

25         [4] ProClarity maintains that data value and data type are "attributes" of data, rather than
     distinct "categories of data."

ORDER - 11

1    all or a majority of the *data and structure* in the data source is *accessed* and saved to the new

2    databases." '694 patent, Col. 13:67 - 14:3 (emphasis added); <u>see also</u> '511 patent, Col. 11:63-66

3    (same).  Timeline also observes that the specification describes a procedure in which "general

4    information is loaded" and where "[g]eneral information includes information about the structure of

5    the data in the data source."  '694 patent, Col. 16:27-39; <u>see also</u> '511 patent, Col. 13:46-58 (same).

6           Timeline also notes that in <u>Timeline v. Sagent</u>, Judge Coughenour construed the term

7    "content" and held as follows:

> Defendant claims content is limited to data values stored in the data source.  Plaintiff agrees
> and includes data values, but claims it also includes information about data structure.
> Defendant bases its argument on a juxtaposition of the terms "content" and "structure" in the
> specification and infers that they must refer to different things.  The Court does not adopt
> defendant's narrow construction of the term.  It looks first to the claim language.  Claims 1, 6,
> 14, 15, 16 require that information about data be obtained by accessing content.  Therefore,
> the Court concludes that content must include information about data structure.

12   Ex. A to Pl.'s Opening Brief at 4.

13          In response, ProClarity correctly observes that Judge Coughenour's ruling is not binding on

14   this court.  However, Judge Coughenour's construction may be regarded as instructive and is not

15   inconsistent with the proposed construction offered by Timeline.

16          ProClarity also contends that the prosecution history contradicts Timeline's proposed

17   construction.  ProClarity argues that the term "content of information stored in said [first] data

18   source" was added to distinguish the '511 patent from a piece of prior art, which the parties refer to as

19   the "Lu" patent.  Timeline acknowledges that this term was added to overcome Lu.  During the

20   prosecution of the '511 patent, Timeline argued that Lu obtained information about data structure by

21   using information about a data source's "format," rather than its content.  Therefore, Timeline

22   maintains that it added the term "content of information" to clarify that the invention did not solely

23   access information about a data source's "format" to obtain information about a data source's

24   structure.  <u>See, e.g.</u>, Dkt. No. 73, '511 patent history at 91 ("obtaining information about data

25

1   structure involves obtaining information about the <u>content</u> of the database, not just its format.")

2   (emphasis in original).

3       As noted earlier, prosecution history is generally less useful for claim construction purposes

4   than the claims and specification.  A court should limit claims based on prosecution history only if the

5   "alleged disavowing actions or statements made during prosecution [are] both clear and

6   unmistakable." <u>Omega Eng'g, Inc. v. Raytek Corp.</u>, 334 F.3d 1314, 1326 (Fed. Cir. 2003).  Here, the

7   prosecution history does not clearly and unmistakably show that Timeline limited the term "content of

8   information" to simply mean "value and type of data."

9       The court also agrees with Timeline's position that the term "content of information" should be

10  construed to include information such as data values and information about structure.  Both sides

11  agree that the term encompasses data values.  In addition, Timeline's argument that the term includes

12  information about structure finds support in the intrinsic evidence.  As discussed above, the

13  specifications indicate that "[a] procedure is first done in which all or a majority of the *data and*

14  *structure* in the data source is *accessed* and saved to the new databases."  '694 patent, Col. 13:67 -

15  14:3 (emphasis added); <u>see also</u> '511 patent, Col. 11:63-66 (same).  This suggests that "content of

16  information" includes both data and information about structure.

17       Therefore, the Court construes the term "content of information" to mean "information in a

18  data source such as data values and information about structure."  Although Timeline seeks to include

19  the words "and other information" at the end of this phrase, the court omits those words because they

20  add nothing of substance.

21

22

23

24

25

1   **E.      "Data Structure"**

2          The term "data structure" appears in all claims of the '511, '382, and '617 patents and in

3   claims 10-15 and 19-25 of the '392 patent.  In these claims, the term is generally used to describe a

4   driver obtaining information about the "data structure" of a data source.

5          The parties agree that the term "data structure" refers to the way data is organized.  However,

6   Timeline argues that the term refers to the "logical organization of data such as tables, columns, or

7   rows" while ProClarity asserts that the term means "organizational scheme between content of

8   information."

9          The term "data structure" is not expressly defined in the specifications.  However, Timeline

10  notes that the specifications refer several times to the "logical structure" and "logical organization" of

11  data.  For example, the '511 patent refers to "[t]he data organized in the logical structure of depicted

12  in FIG. 1."  '511 patent, Col. 6:12-13; <u>see also</u> <u>id.</u> Col. 5:64-65 (noting that "FIG 1. is intended to

13  depict the logical structure of the data organized into a plurality of files").  As a result, there is some

14  support in the intrinsic evidence for construing data structure as a "logical organization" of data.

15         By contrast, ProClarity's proposed construction is somewhat vague and is not well-supported

16  by the intrinsic evidence.  Although ProClarity suggests that Timeline's proposed construction is

17  deficient because it would not encompass the physical layout of data, Timeline's proposed

18  construction specifies that the term includes tables, columns, or rows.

19         Therefore, the court construes the term "data structure" to mean "the logical organization of

20  data such as table, columns, or rows."

21  **F.      "Obtain . . . information about the data structure . . . [by] accessing content of
            information."**

22

23         The parties did not agree on the precise wording of this disputed term.  However, the briefing

    focuses on the term put forward by ProClarity ("obtain . . . information about the data structure . . .

24
    [by] accessing content of information . . .").  This term appears in all claims of the '511, '382, and

25

1    '617 patents.  It also appears in claims 10-15 and 19-25 of the '392 patent, as well as claims 5, 11, and

2    19-23 of the '694 patent.   This term includes several other disputed terms discussed earlier, including

3    "information," "data structure," and "content of information."   As a result, the court's construction of

4    this term essentially turns on its construction of the other disputed terms.

5            Timeline's proposed construction of the term is "accessing the information in a data source to

6    obtain information about the logical organization of the data in the source."  ProClarity's proposed

7    construction is "the computer program derives, via intelligent interrogation, the organizational scheme

8    between content of information by accessing that content alone."

9            Timeline's proposed construction flows from its proposed constructions of the disputed terms

10   "information," "content of information," and "data structure."  Because the court has largely adopted

11   Timeline's proposed constructions of those terms, the Court also adopts Timeline's proposed

12   construction of this term.

13           Therefore, the court construes the term "obtain . . . information about the data structure . . .

14   [by] accessing content of information" to mean "accessing the information in a data source to obtain

15   information about the logical organization of the data in the source."

16   **G.    "Database"**

17           With the exception of claims 1-2 and 4-7 of the '617 patent, the term "database" appears in all

18   claims of every patent.  The term is primarily used in the patent claims to describe a database that is

19   created by the invention.  For example, claim 1 of the '511 patent describes using information to

20   define a structure for a "first database" that did not previously exist, while claim 2 of the '511 patent

21   describes using a driver to store at least some information from a data source into the "first database."

22   In a different context, the '382 patent also uses the term "database" to describe a type of "data source"

23   from which information may be retrieved.  See '382 patent, claim 24.

24           Timeline's proposed construction of "database" is "a collection of organized information

25   accessible through computer software.  A database is not to be confused with a data repository which

ORDER - 15

1    is a file or other data storage structure in which the database is stored."  ProClarity's proposed

2    construction is "a recorded reference to a database repository which serves as the location where the

3    information loaded from the data source or sources will be saved into data tables."

4         As Timeline notes, its proposed construction finds support in contemporaneous dictionary

5    definitions of the term.  See, e.g., American Heritage Dictionary (2d ed. 1985) (defining "database" as

6    "a comprehensive collection of related data organized for convenient access, generally in a

7    computer"); The Computer Glossary (1995) (defining database as "(1) a set of interrelated files that is

8    created and managed by a DBMS [database management system].  (2) Any electronically-stored

9    collection of data").  However, Timeline's proposed construction is also extremely broad.

10   Conceivably, it could  encompass virtually any collection of information stored on a computer –

11   including information collected in "flat file" forms such as a spreadsheet.  As ProClarity notes, the

12   specification for the '511 patent explicitly observes that information "may be stored in forms that are

13   not, strictly speaking, database forms such as storing data in a 'flat file' form, as a spreadsheet, and the

14   like." '511 patent, Col. 2:20-23.  In addition, the '511 patent specification acknowledges that "at least

15   according to some usage, 'flat file' information storage is not a true database system."  '511 patent,

16   Col. 5:52-54.

17        ProClarity also argues that a "database" as used in the claims is essentially a container in which

18   data is stored (i.e., a repository), rather than the actual collection of information itself.  In a similar

19   vein, ProClarity contends that Timeline's proposed construction is deficient because it would fail to

20   account for an "empty database."  In response, Timeline argues that the patent claims distinguish a

21   "database" from a "repository."  For example, Timeline points to claim 17 of the '382 patent, which

22   claims "[a] method . . . further comprising creating a database repository without first forming said

23   new database." '382 patent, Col. 24:41-43.  Timeline also argues that a database must contain data,

24   noting that claim 24 of the '382 patent uses the term "database" to describe a particular type of data

25   source.

1    The court declines to adopt either parties' proposed construction in full.   The court agrees

2    with Timeline that the term "database" cannot be construed as a "recorded reference to a database

3    repository where information from a data source will be stored."   This proposed construction finds

4    little support in the intrinsic evidence and such a cramped construction would not fairly encompass the

5    term as it is used in the patents.   By contrast, Timeline's proposal that a database is a "collection of

6    organized information" is consistent with the ordinary meaning of the term.   Although ProClarity

7    suggests that the term should be construed to allow for an "empty database," a logical reading of the

8    term would dictate that a database includes data.   The patents plainly describe the creation of

9    databases that contain data from various sources.   For example, the '511 specification notes that the

10   invention "may create one or more new databases 808, containing data from one or more of the

11   various data sources . . . ."   '511 patent, Col. 10:16-18.

12   However, the court also agrees with ProClarity's argument that a database, as the term is used

13   in the patents, does not include a collection of information stored in a "flat file" form such as a

14   spreadsheet.   As discussed above, the specification for the '511 patent expressly noted that

15   "information may be stored in forms that are not, strictly speaking, database forms such as storing data

16   in a 'flat file' form, as a spreadsheet, and the like."   The '511 patent specification includes other

17   examples contrasting "flat file" systems to database systems.   See, e.g., '511 patent, Col. 8:23-42

18   (comparing scientific or technical information stored in a flat file system to information stored in a

19   relational database system).   In light of such language in the specification, a person of ordinary skill in

20   the art who reviewed the '511 patent would likely conclude that the patentee did not intend the term

21   "database" to encompass a collection of information stored in a "flat file" form.

22   Therefore, the court construes the term "database" to mean "a collection of organized

23   information accessible through computer software, distinguishable from a collection of information

24   stored in a flat file form such as a spreadsheet."

25

ORDER - 17

**H.    "Wherein said [first] database did not exist"**

This term appears in all claims of the '511 patent, as well as claim 2 for the '382 patent and claims 2-15 and 19-25 of the '392 patent. In claim 1 of the '511 patent, the term is used as follows: "using first information to define a structure for a first database different from said data sources *wherein said first database did not exist* before said step for using said first driver to automatically obtain first information." (emphasis added). In claim 6 of the '511 patent, the term is used similarly, describing "using said first and second information to define a structure for a first database different from said first and second data sources *wherein said first database did not exist* before said step for using said first and second drivers to obtain first and second information." (emphasis added).

Timeline asserts that "[t]his is a fragment of a phrase and can not be satisfactorily defined out of context; attempts to do so inevitably distort the meaning." However, Timeline states that the term means:

> [A]t the point in time at which the "step for using said first driver to automatically obtain first information" was performed, the first database did not exist. Equivalently, the first database is sufficiently different in form or substance from databases known to exist at the point in time at which the "step for using said first driver to automatically obtain first information" was performed that the first database is different from such previous database (if any).

In contrast, ProClarity's proposed construction simple and direct: "The database is not created until after the first (or first and second) driver(s) access the content of their respective data sources."

The term "wherein said [first] database did not exist" plainly refers to the creation of a new database. However, Timeline argues that the definition of this term should include an additional meaning, arguing that "a database might be sufficiently changed that it constitutes a different database." Pl.'s Opening Brief at 20. In essence, Timeline argues that a database that "did not exist" may not only be a new database, but may also be a "different" database.

Timeline does not cite persuasive intrinsic evidence to support this additional meaning. It should also be noted that in <u>Timeline v. Sagent</u>, Judge Coughenour construed this term in a manner that is generally consistent with ProClarity's proposal. Judge Coughenour held that "the phrase must

mean that a database is created after the first (or first and second) driver(s) accessed the content of the first (or first and second) data source(s)."  Ex. A to Pl.'s Opening Brief at 6.  While the court is not bound by Judge Coughenour's construction, the court finds his construction reasonable and consistent with the ordinary meaning of the term and the intrinsic evidence.

Therefore, the court construes the term "wherein said [first] database did not exist" to mean "the database is not created until after the first (or first and second) driver(s) access the content of their respective data sources."

## I.    "Optimization"

The term "optimization" appears in claim 1 of the '382 patent, claims 1-18 of the '392 patent, claims 11-26 of the '617 patent, and claims 19-22 of the '694 patent.  The term is generally used in the following context: ". . . wherein said information about the data structure leads to *optimization* of said new database . . . ."  See, e.g., '382 patent, Col. 23:20-23 (emphasis added).

Timeline's proposed construction of the term "optimization" is "providing performance with respect to a given characteristic (e.g. speed or flexibility of output) that is superior to the performance of some other possible configuration with respect to that characteristic."  Timeline argues that the term is defined in the specification for the '694 patent, which states:

> [A] database is *optimized* for speed and/or flexibility of output if it provides speed or flexibility of output which is superior to the speed or flexibility of some other possible configuration. Thus, in this context, "optimized" does not necessarily require a mathematically precise optimization.

'694 patent, Col. 18:52-57 (emphasis added).  Timeline notes that the definition of a term in a patent specification controls the interpretation of the term.  See, e.g., Schoenhaus v. Geneso, Inc., 440 F.3d 1354, 1358 (Fed. Cir. 2006) ("The patentee is free to act as his own lexicographer, and may set forth any special definitions of the claim terms in the patent specification or file history, either expressly or impliedly.")

ORDER - 19

1    ProClarity's proposed construction is "prepared for a particular purpose."  In its briefing,

2 ProClarity offers little if any support for this proposed construction.  Instead, ProClarity argues that

3 the term "optimization" is subjective and indefinite.  However, ProClarity acknowledged at oral

4 argument that its indefiniteness argument would be more appropriately presented in a summary

5 judgment motion, rather than at the claim construction phase of the litigation.

6    Therefore, the court construes "optimization" to mean "providing performance with respect to

7 a given characteristic (e.g. speed or flexibility of output) that is superior to the performance of some

8 other possible configuration with respect to that characteristic."

9 **J.    "Without the Need for Human Analysis"**

10    This term is included in all claims of the '382, '617, and '694 patent, as well as claims 1-5 of

11 the '511 patent and claims 1 and 16-25 of the '392 patent.  In the '511 patent, the term is used to

12 describe a step that uses a driver to obtain information about the data structure of a data source

13 "without the need for human analysis" of the data source.  '511 patent, Col. 19:46-51.

14    In the joint claim construction chart, Timeline argues that this term is "a fragment of a phrase

15 and can not be satisfactorily defined out of context; attempts to do so inevitably distort the meaning."

16 Alternately, Timeline proposes:

17    "A second step for using said first driver to automatically obtain first information about the
      data structure of said first data source without the need for human analysis of the first data
18    source" means that it is possible (though not always required) to perform the "second step"
      without human analysis.  In other words, the second step has the characteristic that human
19    analysis is not needed for performance of the step, although human analysis or other
      involvement may be provided for if desired.
20

21 Pl.'s Opening Br. at 18.  ProClarity's proposed construction is more straightforward:  "Not requiring

22 any evaluation or choice by a human."

23    ProClarity's proposed construction generally reflects the ordinary meaning of this term, which

24 is not difficult to discern.  "Without the need for human analysis" obviously means that human

25 evaluation or choice is not required.  The parties' dispute over this term appears to be based on an

ORDER - 20

1  assumption that ProClarity's proposed construction would mean that human analysis is prohibited.

2  However, the court sees no reason why ProClarity's construction, when read literally, would mandate

3  such a result.  Simply because human evaluation or choice is not required would not mean that human

4  evaluation or choice is never allowed.

5       Therefore, the court construes the term "without the need for human analysis" to mean "not

6  requiring evaluation or choice by a human."  The court does not include the word "any" from

7  ProClarity's proposed construction because it is not necessary to reflect the ordinary meaning of the

8  term.

9                                    **IV.  CONCLUSION**

10       This order addresses ten disputed claim terms.  However, the parties have indicated that there

11  are nineteen additional claim terms in dispute.  Because the court will not consider more than ten

12  disputed terms in a single Markman hearing, the parties are directed to meet and confer to determine

13  which ten terms should be the subject of the next Markman hearing and to establish a briefing

14  schedule.  As before, the briefing schedule should provide for the simultaneous submission of opening

15  briefs by the parties, as well as the simultaneous submission of rebuttal briefs.

16       If the parties are able to reach an agreement on these scheduling issues, the parties should

17  submit a stipulation and proposed order to the court.  If the parties cannot reach an agreement after

18  conferring in good faith, they should notify the court and the court will establish a schedule.

19       Dated this 29th day of June, 2006

20

21                                    s/James L. Robart
                                      JAMES L. ROBART
22                                    United States District Judge

23

24

25

ORDER - 21