The Honorable James L. Robart

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

| | | |
|---|---|---|
| TIMELINE, INC., a Washington corporation, | ) | No. CV05-1013JLR |
| Plaintiff, | ) | MICROSOFT'S MOTION FOR SUMMARY JUDGMENT AND FOR DISMISSAL OF STATE-LAW CLAIMS |
| v. | ) | |
| PROCLARITY CORPORATION, an Idaho corporation; and MICROSOFT CORPORATION, a Washington corporation, | ) | Noted on Motion Calendar: Friday, February 9, 2007 |
| Defendants. | ) | **Oral Argument Requested** |

## I. NATURE OF THE CASE AND THE PRESENT MOTION

### A.     The Issues Presented by the Pleadings

Timeline has sued Microsoft for direct and indirect infringement of Timeline's patents and for breach of two contracts:  the 1995 "SBFM Agreement" and the 1999 "License Agreement."  Second Amended Complaint ¶¶ 30-42, Docket # 199.  Microsoft answered, denying the charges and alleging among other things that the patent claims against it are barred by a license from Timeline.  Answer, Affirmative Defenses, and Counterclaims at 13, ¶¶ 48-49, Docket # 213.

MICROSOFT'S MOTION FOR SUMMARY JUDGMENT - 1
(CV05-1013JLR)
SEA 1926213v3 0025936-000646_

Davis Wright Tremaine LLP
LAW OFFICES
2600 Century Square · 1501 Fourth Avenue
Seattle, Washington  98101-1688

Shortly before it sought leave to file the Second Amended Complaint, Timeline purported to "terminate" Microsoft's license on the ground of supposed "material breaches" and "repudiation" of the License Agreement by Microsoft. *See* Second Amended Complaint ¶ 22. Microsoft therefore sought (among other things) a declaratory judgment that (a) the purported termination did not affect a license that by its terms is "permanent, irrevocable, [and] fully paid"; (b) Microsoft's alleged actions do not justify termination of the 1999 License Agreement; and (c) the License Agreement remains in full force and effect. *Id.* at 22-24, ¶¶ 8-12 & E.

### B.     Relief Requested by the Present Motion

Microsoft seeks summary judgment in its favor on Timeline's patent-infringement claims and on the portion of Microsoft's counterclaim relating to the continuing validity of the License Agreement and the license. Microsoft also seeks dismissal under 28 U.S.C. § 1367(c) of those contractual issues that cannot be resolved on summary judgment and that are not material to the disposition of Timeline's patent claims, should any survive. State court is the appropriate forum for resolution of contractual disputes between these two Washington corporations that implicate no federal interest.

## II.  CHRONOLOGY OF UNDISPUTED FACTS

### A.     The 1995 SBFM Agreement

In June 1995, Microsoft and Timeline entered into a "Software Development and License Agreement," (the "SBFM Agreement") by which Timeline agreed to work with Microsoft to develop aspects of a software application originally known as "Accounting Assistant" and later called "Small Business Financial Manager," or "SBFM." *See* Declaration of Bart Eppenauer, ¶ 2, Exhibit 1.[1]

---

[1] For the Court's convenience, relevant portions of the SBFM Agreement are attached to this Motion as Exhibit A.

MICROSOFT'S MOTION FOR SUMMARY JUDGMENT - 2
(CV05-1013JLR)
SEA 1926213v3 0025936-000646_

Davis Wright Tremaine LLP
LAW OFFICES
2600 Century Square · 1501 Fourth Avenue
Seattle, Washington 98101-1688

In Paragraph 11 of the SBFM Agreement, Timeline agreed not to develop or market a competing product as long as Microsoft was marketing SBFM.  In Paragraph 12, Microsoft agreed that if it ceased to market SBFM, then upon Timeline's request Microsoft would deliver to Timeline "the names and addresses of users of [SBFM] who have registered with [Microsoft]," and would also "deliver any copies of the Source Code . . . still held by [Microsoft]."  *Id.*

During 1996 and 1997 the parties entered into six numbered amendments to the SBFM Agreement.  *Id.* ¶ 3. These amendments, which dealt primarily with modifications to the fee schedule, time schedule, and technical aspects of Timeline's work, are immaterial to the current dispute.

## B.    The 1999 License Agreement

In September 1998 Timeline obtained the '511 patent in suit.   Second Amended Complaint ¶ 8.  Timeline asserted (and Microsoft disputed) that Microsoft's forthcoming SQL Server 7.0 application release would infringe one or more valid claims of this patent.  *Id.* ¶ 15. SQL Server 7.0 is a database management application.  After negotiations lasting several months, in which both parties were represented by counsel, the parties entered into the 1999 Patent License Agreement.  Eppenauer Declaration ¶ 4, Ex. 2 (1999 Agreement).[2]

By its terms, the License Agreement granted Microsoft "a non-exclusive, perpetual, irrevocable, fully paid, worldwide right and license" under the "Licensed Patents."  *Id.*, 1999 Agreement ¶ 2.1.  "Licensed Patents" was a defined term that covers all patents-in-suit in this case.  *See id.* ¶ 1.1.

Timeline "irrevocably and without fee covenant[ed] not to sue and release[d], acquit[ted], and forever discharge[d] Microsoft ... from any and all claims of Infringement of the Licensed Patents . . . occurring ***before, on or after*** the Effective Date of this Agreement."  *Id.* ¶ 3.2

---

[2] A copy of the 1999 License Agreement is attached to this Memorandum as Exhibit B.

MICROSOFT'S MOTION FOR SUMMARY JUDGMENT - 3
(CV05-1013JLR)
SEA 1926213v3 0025936-000646_

Davis Wright Tremaine LLP
LAW OFFICES
2600 Century Square · 1501 Fourth Avenue
Seattle, Washington  98101-1688

1    (emphasis added).  "Infringement" was defined to "include direct infringement, contributory

infringement, and inducement to infringe."  *Id.* ¶ 1.7.

2        In return for the license, release, and covenant not to sue, Microsoft agreed (1) to pay

3    Timeline "a fully paid up, non-refundable license fee of Five Million Dollars (US $5,000,000)";

(2) to enter into a Seventh Amendment to the SBFM Agreement; and (3) to give Timeline

4    Microsoft "Partner" status, described as follows:

5        Microsoft shall afford to Timeline "Partner" status in the Microsoft Solution
         Providers program (or its successors or equivalents) for a period of 60 calendar

6        months starting June 1, 1999 [through May 31, 2004].  As such, Timeline shall be
         entitled during such period to all the rights and privileges associated with such

7        status, most particularly development software and support and marketing support
         as is then normal and customary for firms of such status under Microsoft's then-

8        standard program (or its successors or equivalents).

9    *Id.* ¶ 4.1.  The License Agreement provided that these three obligations "constitute the total

consideration due to Timeline under this Agreement."  *Id.* ¶ 4.2.

10       The parties executed the Seventh Amendment to the SBFM Agreement and the License

11   Agreement concurrently.  Eppenauer Decl. ¶ 5, Ex. 3 (7th Amendment).  The sole operative

12   provision of the Seventh Amendment was deletion of Timeline's covenant not to compete in

paragraph 11 of the original 1995 SBFM Agreement.  *Id.*  It is undisputed that Microsoft also

13   paid the $5 million license fee, enrolled Timeline as a "Partner" in the Solution Providers

14   program for all 5 years, and provided Timeline with free "software licenses and access to limited

15   technical support."  Kinkead Decl. ¶ 2, Exhibit 1 (Timeline Response to Interrogatory 6 ).  Thus,

16   the only aspect of partner status that Timeline claims Microsoft somehow violated is the clause

requiring "marketing support as is then normal and customary for firms of such status under

17   Microsoft's then-standard program (or its successors)...."  1999 License Agreement ¶ 4.1(c),

18   Ex. 2 to Eppenauer Decl.

19       Nothing in the License Agreement made the continuing validity of the release and license

20   conditional on Microsoft's on-going performance of its obligations with regard to marketing

21

22   MICROSOFT'S MOTION FOR SUMMARY JUDGMENT - 4
     (CV05-1013JLR)
     SEA 1926213v3 0025936-000646_

Davis Wright Tremaine LLP

LAW OFFICES
2600 Century Square · 1501 Fourth Avenue
Seattle, Washington  98101-1688

23

support, or authorized Timeline to terminate the Agreement if there was a failure to perform these obligations. Rather, the Agreement described the license as "permanent, irrevocable, [and] fully paid." The License Agreement also contained an integration clause, ¶ 12.1, providing in part:

> This agreement sets forth *the entire agreement* and understanding between the parties with respect to the subject matter hereof and merges all prior discussions between them, and *none of the parties shall be bound by any conditions*, definitions, warranties, understandings, or representation with respect to the Licensed Patents or any other subject matter hereof *other than as expressly provided herein* or as duly set forth on, or subsequent to, the date hereof in writing and signed by the party bound thereby or its duly authorized representative.

1999 License Agreement ¶ 12.1, attached to Eppenauer Decl. as Ex. 2 (emphasis added).

## C. The 1999 Microsoft v. Timeline Lawsuit ("*Timeline I*")

Almost immediately after Microsoft's $5,000,000 hit Timeline's bank account, a dispute arose concerning the protection that the License Agreement provided to "Microsoft Licensees." "Microsoft Licensees" was a defined term that included independent software vendors ("ISVs") and other entities licensed by Microsoft or its Subsidiaries or Affiliates who purchased Microsoft-branded products. *See id.* ¶¶ 1.4, 1.6. In many cases such ISVs developed and distributed Microsoft products in combination with their own complementary software. Paragraph 2.2 of the License Agreement granted Microsoft a limited power to sublicense the Timeline patents to such Licensees, and Paragraph 3.3 limited the scope of Timeline's covenant not to sue such Licensees. The parties disagreed as to the meaning of these limitations.

Microsoft took the position that Microsoft Licensees were protected by the License Agreement from claims of Infringement unless their software independently infringed some valid claim of a licensed Timeline patent; Timeline took the position that neither the License Agreement nor any sublicense could protect any ISV if the ISV's software in combination with Microsoft's software fell within the scope of any valid claim of a Timeline patent and if the

MICROSOFT'S MOTION FOR SUMMARY JUDGMENT - 5
(CV05-1013JLR)
SEA 1926213v3 0025936-000646_

Davis Wright Tremaine LLP
LAW OFFICES
2600 Century Square · 1501 Fourth Avenue
Seattle, Washington  98101-1688

ISV's software performed a material step in the claimed invention. *Microsoft v. Timeline, Inc.*, 2002 WL 339338 (March 4, 2002). Within weeks after the License Agreement was signed, Microsoft sued Timeline in King County Superior Court for a declaratory judgment as to the scope of the License Agreement in this regard and issued a press release stating its position on the issue in dispute. *Id.* Timeline counterclaimed for declaratory relief and for breach of the License Agreement but later voluntarily dismissed its claims of breach. Kinkead Decl. ¶ 3.

During a three-day non-jury trial in 2000, the parties presented evidence on the history of the negotiations and the business setting of their dispute. *Id.* Although Timeline's counterclaims for breach of contract had been dismissed, Timeline's President Charles Osenbaugh testified that Microsoft had not lived up to the spirit of the bargain between the companies, that Microsoft had improperly encouraged third-party ISVs and others to disregard Timeline's patent rights, and that Microsoft had asserted in its 1999 press release and otherwise that ISVs that made or distributed otherwise infringing combination products were protected by Microsoft's License Agreement. Kinkead Decl. ¶ 4, Exs. 2 and 3 (excerpts of Mr. Osenbaugh's *Timeline I* depositions). Mr. Osenbaugh also complained that Microsoft had not provided Timeline the full support promised under the "Partner" or "Solution Provider program"; he testified that the value of this support could be as much as $100,000 per year. *Id.* Ex. 6 (Osenbaugh trial testimony at 90:7-20).

Trial Judge Steven Scott ruled in favor of Microsoft, finding that Microsoft's proposed construction of the License Agreement represented the business deal that the parties had in fact agreed to, that the construction sought by Timeline made no business sense, and that Mr. Osenbaugh's testimony with regard to the negotiations was less credible than the testimony of the Microsoft employees. His letter ruling is attached as Ex. 4 to the Kinkead Decl.

The judgment in favor of Microsoft was reversed on appeal. The Court of Appeals held that regardless of the parties' actual agreement, the construction sought by Microsoft could not be reconciled with the words of the contract. *Microsoft v. Timeline, Inc.*, 2002 WL 339448 (Wash. Ct. App. March 4, 2002).

MICROSOFT'S MOTION FOR SUMMARY JUDGMENT - 6
(CV05-1013JLR)
SEA 1926213v3 0025936-000646

Davis Wright Tremaine LLP
LAW OFFICES
2600 Century Square · 1501 Fourth Avenue
Seattle, Washington  98101-1688

### D.    The ProClarity Case

Before its acquisition by Microsoft, ProClarity Corporation was an ISV of the sort that was at the heart of the dispute presented by the *Timeline I* case.  ProClarity sold report-writing software that worked in conjunction with Microsoft's SQL Server.  Complaint ¶ 13 (Docket # 1).  In June 2005 Timeline sued ProClarity for patent infringement.  *Id.*

In January 2006 Timeline sought to discover confidential communications between Microsoft's attorneys and ProClarity's counsel relating to the Timeline patents and the conduct of ProClarity's defense.  *See* Docket # 64.   Microsoft and ProClarity resisted, asserting that such communications fell within the joint-defense privilege and the work product doctrine.  *See* Docket # 86.  Timeline responded that there could be no legitimate joint defense privilege or work-product claim because under the License Agreement Microsoft had no reason to fear litigation: "Microsoft is not liable even if it induces its customers to infringe by using a combination not covered by the Microsoft license."  *See* Docket # 90, Plaintiff's Reply re Motion To Compel at 2 (Jan. 27, 2006).  Timeline explained that "Timeline granted Microsoft a covenant not to sue.  Thus, **Microsoft is not liable even if it induces its customers to infringe by using a combination not covered by the Microsoft license.**"  *Id.* (emphasis added)*.*  Timeline prevailed on the motion.  *See* Docket # 118.

After the Court had granted Timeline's Motion To Compel, and after Microsoft had acquired ProClarity, bringing it within the shelter of the Patent License as a Microsoft Subsidiary – an issue not presented here – Timeline sent Microsoft notice that it had "terminated" the License Agreement:

> because Microsoft has materially breached and repudiated its obligations under the Agreement, including but not limited to paragraphs 2.2, 4.1, the acknowledgment that Timeline is the owner of the licensed patents, and the implied covenant of good faith and fair dealing.  Microsoft has violated the spirit of the Agreement as well as the letter of the Agreement by continually taking steps to deprive Timeline of the benefit of its bargain.

Eppenauer Decl. ¶ 6, Ex. 4.  Timeline did not offer to return Microsoft's $5,000,000 or

Davis Wright Tremaine LLP
LAW OFFICES
2600 Century Square · 1501 Fourth Avenue
Seattle, Washington  98101-1688

any portion of it. *Id.*

## III.  TIMELINE'S FACTUAL ALLEGATIONS RELATING TO BREACH

Timeline's responses to Interrogatories 1 through 3, Exhibit 5 to the Kinkead Declaration, sets forth its contentions with regard to the conduct alleged to be a "material breach" justifying termination of Microsoft's license.[3]  In summary, Timeline contends that Microsoft:

- failed to deliver the SBFM source code and user list, despite request (*id.* at 11:1-15);
- failed "to provide marketing benefits and other Partner rights that were "customary for firms of such [Partner] status" (11:19-20);
- "directly and intentionally interfered with Timeline's attempts to market its products and license its patents" (11:21-23);
- "repeatedly made false statements concerning Timeline's rights, including but not limited to the following:" (12:2-3);
  - made statements to third parties during the *Timeline I* case concerning Microsoft's interpretation of the License Agreement, which may have discouraged Microsoft Licensees from negotiating patent licenses with Timeline (14:18-25);
  - made statements supporting ProClarity in bidding against Timeline on jobs (12:18-24);
  - issued a press release in 1999 stating Microsoft's interpretation of the License Agreement (12:25-26);
  - supported ProClarity in its defense against Timeline's claims in this lawsuit, including attacks on Timeline's ownership of the patents in suit and on the identification of the inventors of the claimed inventions (13:22-14:9); and

---

[3] Copies of Timeline's responses to the relevant interrogatories are attached as Exhibit C.

MICROSOFT'S MOTION FOR SUMMARY JUDGMENT - 8
(CV05-1013JLR)
SEA 1926213v3 0025936-000646_

Davis Wright Tremaine LLP
LAW OFFICES
2600 Century Square · 1501 Fourth Avenue
Seattle, Washington  98101-1688

- provided substantial marketing and development support to companies to create and market products that in combination with Microsoft products infringe Timeline's patents (15:19-15);
-  encouraged companies to buy a combination of Microsoft and Infinium software instead of competing software sold by Timeline, and otherwise engaged in unspecified "commercial disparagement" of Timeline (Second Amended Complaint ¶ 19);
- purported to grant its Licensees actual or implied sublicenses beyond the scope authorized by Paragraph 2.2 of the License Agreement as construed by the Court of Appeals (13:18-19); and
- took many actions that encouraged and induced third parties to develop and sell infringing combination products (16:26-18:22).

For purposes of the present Motion only, Timeline's factual contentions may be accepted as true. Many of them will be disputed if any of Timeline's claims go to trial; but the disputes are not material to this Motion.

## IV.  ARGUMENT

### A.    Summary of Argument

Breach of the SBFM Agreement, even if shown, does not constitute a breach of the separate 1999 Patent License Agreement as a matter of Washington law.  Timeline should be remitted to state court to pursue any claim for alleged breach of the SBFM agreement.

Microsoft's only on-going obligation under the 1999 Agreement was to provide Timeline with certain benefits under the "Solution Provider program," or its successors or equivalents, through May 31, 2004.  As a matter of Washington law, other undertakings cannot be read into the License Agreement under the guise of construction, implication, or the duty of good faith.

Even taking as true Timeline's factual allegations with regard to Microsoft's failure to provide the marketing benefits called for under "Solution Provider program," such alleged

MICROSOFT'S MOTION FOR SUMMARY JUDGMENT - 9
(CV05-1013JLR)

SEA 1926213v3 0025936-000646_

Davis Wright Tremaine LLP
LAW OFFICES
2600 Century Square · 1501 Fourth Avenue
Seattle, Washington  98101-1688

failure does not justify cancellation of the license, for three independent reasons. First, an "irrevocable" patent license cannot be revoked, whether such revocation is labeled "termination," "cancellation," or "annulment." Second, no reasonable jury could find that Microsoft's alleged nonfeasance is a "material breach" as that term is defined under Washington law. Third, termination is barred by Timeline's express affirmance of the License Agreement, in this Court and elsewhere, after it was fully on notice of the conduct allegedly constituting such a breach.

If Microsoft's irrevocable license remains in effect then, as Timeline has admitted, it bars any claims against Microsoft for direct or indirect infringement of any of the Timeline patents. The only remaining issues therefore are Timeline's contractual claims having no bearing on the patent disputes and Microsoft's counterclaim against Timeline for breach of the covenant not to sue. These are issues that the Washington court could readily resolve.

**B.      The Governing Law Is That of the State of Washington.**

Although patents are governed exclusively by federal law, license agreements are contracts governed by state law. *E.g., Metabolite Labs., Inc. v. Laboratory Corp. of Am. Holdings,* 370 F.3d 1354, 1379-70 (Fed. Cir. 2004); *Fantasy, Inc. v. Fogerty,* 984 F.2d 1524, 1529 (9th Cir. 1993) *rev'd on other grounds*, 510 U.S. 514 (1994). In this case, the parties chose to be governed by the domestic law of the State of Washington. License Agreement ¶ 10; SBFM Agreement ¶ 18 (Eppenauer Exs. 2 and 1).

**C.      Breach of the SBFM Agreement, Even if It Occurred, Is Not Grounds To Terminate the Patent License, as a Matter of Law.**

Timeline alleges that "Microsoft failed to provide the last version of the SBFM source code and a list of end users when Microsoft ceased using it as required by the 1995 Agreement, *which was incorporated by amendment as a part of the 1999 Agreement.*" Amended Complaint ¶ 37 (emphasis added). The italicized portion of the allegation may be disregarded as a

Davis Wright Tremaine LLP

LAW OFFICES
2600 Century Square · 1501 Fourth Avenue
Seattle, Washington 98101-1688

"conclusory allegation[] which [is] contradicted by documents referred to in the complaint." *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003).

Nothing in the language of either the SBFM Agreement or the License Agreement supports Timeline's allegation of incorporation by reference; in fact, the two contracts expressly provide to the contrary. The integration clause of the License Agreement states that it sets forth "the entire agreement and understanding between the parties with respect to the subject matter hereof." License Agreement ¶ 12.1 (Eppenauer Ex. 2). Paragraph 22 of the SBFM Agreement contains similar language. These were separate agreements by their express terms. Breach of one, even if proven, has no effect on the parties' rights and obligations under the other. *See* RESTATEMENT (2D) OF CONTRACTS § 237, comment *d* (1981).

Incorporation by reference, of the sort that Timeline alleges, must be "clear and unequivocal." *E.g., W. Wash. Corp. of Seventh-Day Adventists v. Ferrellgas, Inc.*, 102 Wn.App. 488, 494, 7 P.3d 861, 865 (2000). "When incorporated matter is referred to for a specific purpose only, it becomes a part of the contract for such purpose only, and it should be treated as irrelevant for all other purposes." *Id.*, 102 Wn.App. at 499, 7 P.3d at 868 (quoting Williston on Contracts § 30:25 at 238 (4th ed. 1999)); 17 Am.Jur.2d *Contracts* § 263, at 667 (1964); 17A C.J.S. *Contracts* § 299, at 137 (1963). In this case, the parties expressly stated that they were ***not*** incorporating other contracts or agreements by reference. Each contract stands alone.

The License Agreement went further and provided that "[t]he payment and other consideration set forth in Section 4.1 constitute the ***total consideration*** due to Timeline under this Agreement." License Agreement ¶ 4.2 (emphasis added). Section 4.1 required only that Microsoft "enter into a Seventh Amendment" to the SBFM Agreement, which Microsoft did, deleting Paragraph 11 of the SBFM Agreement and reducing Timeline's obligations under that agreement. Nothing in Section 4.1 or elsewhere made Microsoft's performance of ***its*** obligations under ***other*** provisions of the SBFM Agreement part of the consideration due Timeline under the License Agreement, or made such performance a condition of the continuing effectiveness of the

MICROSOFT'S MOTION FOR SUMMARY JUDGMENT - 11
(CV05-1013JLR)
SEA 1926213v3 0025936-000646_

License Agreement, or made it a ground for terminating that Agreement or the license that it contained. A condition subsequent or a power of termination, like any other contractual term, must arise by agreement of the parties. *See N. State Const. Co. v. Robbins,* 76 Wn.2d 357, 364, 457 P.2d 187, 191 (1969) (condition precedent). To make assurance double sure, paragraph 12.1 the License Agreement specifically provides that "none of the parties shall be bound by ***any*** conditions ... other than as ***expressly*** provided herein ...." (Emphasis added.) Timeline's argument that Microsoft's performance of the SBFM Agreement was a condition of Timeline's covenant not to sue is directly contrary to the express terms of the parties' Agreement.

Washington law is very clear that new substantive terms cannot be imported into contracts under the guise of "construction," "implication," or the duty of good faith. *See, e.g., Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wn.2d 493, 503-04, 115 P.3d 262, 267 (2005); *Badgett v. Security State Bank,* 116 Wn.2d 563, 570, 807 P.2d 356, 360 (1991); *Brown v. Safeway Stores, Inc.,* 94 Wn.2d 359, 370, 617 P.2d 704, 710 (1980). Indeed, in *Timeline I* Timeline prevailed at the Court of Appeals on exactly that ground, despite what the trial court found was the agreement of the parties in fact. The rule should be applied here as well. These are issues that the Court can and should determine as a matter of law.

Timeline's claim for breach of the 1995 SBFM Agreement, ¶¶ 40-42 of its Amended Complaint, should be dismissed without prejudice under the provisions of 28 U.S.C. § 1367(c). Such dismissal will simplify this case, reduce discovery expense, and prevent prejudice to Microsoft from evidence of alleged misconduct in separate and distinct matters. *Cf.* Fed. R. Evid. 404(b) (limiting admissibility of evidence of "other bad acts").

**D.     Substantive Obligations and Restrictions Are Not To Be Added to the License Agreement by "Construction," "Implication," or the Duty of Good Faith.**

Timeline alleges that Microsoft interfered in various ways with its efforts to license its patents to Microsoft Licensees or to enforce its patents against them if they would not agree to

licenses.  In particular, it alleges that Microsoft improperly assisted ProClarity in its defense of this case and that it encouraged ProClarity and others to develop combination products that Timeline deems infringing on its patent claims.  *See* Amended Complaint ¶¶ 16-18, 21; Timeline's Responses to Interrogatories 1-3 (Kinkead Decl., Ex. 5).

Even taking these allegations as true for purposes of this Motion, they do not state a claim for violation of the License Agreement.  The Agreement contains no promise to refrain from such conduct.  As the United States Supreme Court recently said of another license agreement:  "Promising to pay royalties on patents that have not been held invalid does not amount to a promise *not to seek* a holding of their invalidity."  *Medimmune, Inc. v. Genentech, Inc.*, slip op. at 16 (U.S. No. 05-608, Jan. 9, 2007).  The same is true here.

Washington follows the objective manifestation theory of contracts.  "We do not interpret what was intended to be written but what was written."  *E.g., Seattle Times Co.,* 154 Wn.2d at 504, 115 P.3d at 267.  Extrinsic evidence cannot be used to show "an intention independent of the instrument" or to "vary, contradict, or modify the written word."  *E.g., Hollis v. Garwall, Inc.,* 137 Wn.2d 683, 695, 974 P.2d 836, 853 (1999).

In particular, Washington does not allow the implied covenant of good faith and fair dealing to "inject substantive terms into the parties' contract" or "create obligations on the parties in addition to those contained in the contract."  *E.g., Badgett*, 116 Wn.2d at 569-70, 807 P.2d 360.  The obligation of good faith and fair dealing does not alter the express terms of the parties' agreement.  *E.g., Willis v. Champlain Cable Corp.,* 109 Wn.2d 747, 748 P.2d 621 (1988).

More generally, implied covenants are not favored under Washington law.  *Safeway Stores,* 94 Wn.2d at 370, 617 P.2d at 710:

> In order for courts to imply a covenant in a contract, the following requirements must be satisfied:  (1) the implication must arise from the language used or it must be indispensable to effectuate the intention of the parties; (2) it must appear from the language used that it was so clearly within the contemplation of the parties

MICROSOFT'S MOTION FOR SUMMARY JUDGMENT - 13
(CV05-1013JLR)
SEA 1926213v3 0025936-000646_

Davis Wright Tremaine LLP
LAW OFFICES
2600 Century Square · 1501 Fourth Avenue
Seattle, Washington  98101-1688

that they deemed it unnecessary to express it; (3) implied covenants can only be justified on the grounds of legal necessity; (4) a promise can be implied only where it can rightfully be assumed that it would have been made if attention had been called to it; (5) there can be no implied covenant where the subject is completely covered by the contract.

*Id.* In this case, few if any of those requirements are satisfied.

The contract contains no covenant against the conduct alleged in paragraphs 16-18 and 21 of the Amended Complaint and the corresponding provisions of Timeline's interrogatory responses. [4] It provides that the "total consideration" owed Timeline are (1) the payment of $5,000,000, which was made; (2) the execution of the Seventh Amendment to the SBFM Agreement, which was also done; and (3) enrolling Timeline as a "partner" in the "Solution Providers program" and providing associated benefits, which is the subject of the next section of this Motion.  License Agreement ¶ 4.2.  Timeline's attempt to add additional obligations would alter the express provisions of the Agreement.  It also would alter the integration clause, which provides that neither party is bound by "any conditions, definitions, warranties, understandings, or representations ... other than as *expressly* provided herein ...," and that the written document sets forth "the *entire* agreement and understanding between the parties."  Ex. B, Agreement ¶¶ 4.2, 12.1 (emphasis added).

The Court can and should say as a matter of law that conduct of the sort alleged in paragraphs 16-18 and 21 of the Second Amended Complaint is not in any way a breach of the License Agreement, much less one that would justify termination of Microsoft's license. Elimination of these allegations will simplify the case, avoid unnecessary discovery expense, and

---

[4] In its interrogatory responses, Timeline refers to the recital in the License Agreement in which Microsoft acknowledged that Timeline was the owner of the '511 Patent.  Such a recital is not a covenant, promise, or commitment.  *See Rains v. Walby*, 13 Wn.App. 712, 716, 537 P.2d 833, 836 (1975); *cf. Lear, Inc. v. Adkins*, 395 U.S. 653 (1969) (rejecting the doctrine of licensee estoppel).  Timeline also refers to ¶ 2.2 of the License Agreement, granting Microsoft a limited power to sublicense its Licensees.  A purported sublicense in excess of the granted power would be ineffective; but issuing such an ineffective sublicense is not a breach of any covenant, promise, or commitment stated in the License Agreement.

Davis Wright Tremaine LLP
LAW OFFICES
2600 Century Square · 1501 Fourth Avenue
Seattle, Washington  98101-1688

prevent unfair prejudice to Microsoft from evidence of unrelated acts of alleged misconduct. *Cf.* Fed. R. Evid. 404(b) (limiting admissibility of evidence of "other bad acts").

**E.      Microsoft's Alleged Failure To Provide All the Benefits Called for by Paragraph 4.1(c), Even if True, Does Not Justify Timeline's Attempted Termination of Microsoft's "Permanent, Irrevocable" License.**

Timeline alleges, in paragraphs 19-20 of the Amended Complaint, that Microsoft failed to provide it with all the marketing support that was allegedly one of the "normal and customary" benefits of "partner" status under the "Solution Provider program," and that in at least some cases Microsoft actively discouraged Timeline customers and potential customers from purchasing Timeline products. Timeline asserts that such conduct constitutes a "material breach" of the License Agreement, justifying it in terminating Microsoft's license and forfeiting the unearned portion of Microsoft's $5,000,000 license fee. Amended Complaint ¶¶ 16-22.

Taking Timeline's factual allegations as true for purposes of this Motion only, they would not justify termination of the license, for three independently sufficient reasons:

- First, the rule that "material breach" discharges the other party's obligation to perform a contract is "subject to variation by agreement of the parties." RESTATEMENT (2D) OF CONTRACTS § 237, comment *a* (1981). In this case the parties specifically agreed that Microsoft's license was both "permanent" and "irrevocable."

- Second, "material breach" is a "term of art" under Washington contract law, and does not mean merely one that is nontrivial: "[A] material breach is one 'serious enough to justify the other party in abandoning the contract . . . one that substantially defeats the purpose of the contract.'" *Park Avenue Condo. Owners Ass'n v. Buchan Devs, LLC,* 117 Wn.App. 369, 383, 71 P.3d 692, 698 (2003). No reasonable jury could find that that standard was met here, where Timeline admittedly received $5,000,000 in cold cash and it disputes performance valued by its CEO at less than one-tenth of that amount.

MICROSOFT'S MOTION FOR SUMMARY JUDGMENT - 15
(CV05-1013JLR)
SEA 1926213v3 0025936-000646_

Davis Wright Tremaine LLP
LAW OFFICES
2600 Century Square · 1501 Fourth Avenue
Seattle, Washington  98101-1688

- Third, Timeline has affirmed the continued validity of Microsoft's license, in this Court and elsewhere, long after it knew or was on notice of the conduct that it now alleges constituted a "material breach." Its attempted cancellation of the contract following such affirmation comes too late under Washington law.

We elaborate on each of these reasons below.

### 1.   What Part of "Irrevocable" Don't They Understand?

The License Agreement provides that Microsoft's License is both "perpetual" and "irrevocable." ¶ 2.1. "Irrevocable" means "not to be revoked or recalled; unable to be repealed or annulled; unalterable." Random House Unabridged Dictionary 1010 (2d ed. 1993). "We generally give words in a contract their ordinary, usual, and popular meaning unless the entirety of the agreement clearly demonstrates a contrary intent." *Seattle Times Co.*, 154 Wn.2d at 504, 115 P.3d at 267. "Annulled" is another word for "cancelled." *See American Continental Ins. Co. v. Steen,* 151 Wn.2d 512, 521, 91 P.3d 864, 869 (2004). Timeline cannot annul or cancel an irrevocable license by calling it "terminated."

If the parties had agreed to do so, they could certainly have provided that Timeline would have the right to cancel or terminate the license if Microsoft failed to perform fully its obligations under Paragraph 4.1(c) of the License Agreement; but they did not do so. Instead, they agreed that the license was "irrevocable." *Id.* ¶ 2.1. This term must mean more than simply that the license was not terminable at will, an idea already adequately expressed by "permanent."

> An interpretation of a writing which gives effect to all of its provisions is favored over one which renders some of the language meaningless or ineffective. . . . This should be especially true when the writing is the product of a long period of negotiation with both parties having been represented by competent counsel.

*Wagner v. Wagner,* 95 Wn.2d 94, 101, 621 P.2d 1279, 1283 (1980) (citations omitted).

The parties further agreed that neither party was bound by any conditions not *expressly* provided in the Agreement. *Id.* ¶12.1 (emphasis added). Performance of Microsoft's obligations under Paragraph 4.1(c) was not a condition of Microsoft's patent license, expressly or otherwise.

Davis Wright Tremaine LLP
LAW OFFICES
2600 Century Square · 1501 Fourth Avenue
Seattle, Washington 98101-1688

1    When it is doubtful whether contractual language creates a promise or a condition, it is

     interpreted as a promise only.  *Ross v. Harding,* 64 Wn.2d 231, 236, 391 P.2d 526, 531 (1964);

2    *Tacoma Northpark LLC v. NW, LLC,* 123 Wn.App. 73, 80, 96 P.3d 454, 457 (2004).

3          To make the continued validity of Microsoft's "irrevocable" license conditional on

4    substantial performance of its obligations under Paragraph 4.1(c), in contradiction of these

     express provisions of the License Agreement, is prohibited under Washington law.  *E.g., Seattle*

5    *Times Co.,* 154 Wn.2d at 503-04*; Hollis,* 137 Wn.2d at 695.  It would also threaten the stability

6    of every settlement of a patent dispute that contains an "irrevocable" license.

7          **2.      The Breaches Alleged by Timeline Are Insufficient To Justify
                  Termination of the License and Forfeiture of the License Fee.**

8          "A breach will justify rescission of a licensing agreement only when it is of so material

9    and substantial a nature that [it] affect[s] the very essence of the contract and serve[s] to defeat

10   the object of the parties . . . ."  *Rano v. Sipa Press, Inc.,* 987 F.2d 580, 586 (9th Cir. 1993)

     (applying California law to a copyright license; internal quotation omitted), *quoted with approval*

11   *in Warren v. Fox Family Worldwide, Inc.,* 328 F.3d 1136, 1143 (9th Cir. 2003) (copyright

12   license, California law).  *Accord, e.g., Graham v. James,* 144 F.3d 229, 237-238 (2nd Cir. 1998)

13   (copyright license, New York law); *Krell v. Bovaird Supply Co.,* 83 F.2d 414, 416 (10th Cir.

14   1936) (breach of independent contractual provision of patent license, incidental to main purpose

     of contract, does not justify cancellation; damages are the appropriate remedy); *Skil Corp. v.*

15   *Lucerne Prods., Inc.,* 489 F.Supp. 1129, 1165 (N.D. Ohio 1980) (patent license, Ohio law).[5]

16         Washington law is entirely in accord with these cases.  *See Park Avenue Condo. Owners*

17   *Ass'n v. Buchan Devs LLC,* 117 Wn.App. at 383, 71 P.3d at 698; *Mitchell v. Straith,* 40 Wn.App.

18   _____

19   [5] *See also United States v. Snepp,* 595 F.2d 926, 934 (4th Cir. 1979) ("The breach of an
     independent provision in a contract which is incidental to its main purpose and which does not
     go to the whole consideration, does not justify the cancellation of a contract; cancellation is
20   warranted only if the failure is a total one, resulting in the defeat of the object of the contract, or
     rendering that object unattainable." ) (Internal quotes omitted.)

21

22   MICROSOFT'S MOTION FOR SUMMARY JUDGMENT - 17
     (CV05-1013JLR)                                                            Davis Wright Tremaine LLP
     SEA 1926213v3 0025936-000646_                                            LAW OFFICES
23                                                                 2600 Century Square · 1501 Fourth Avenue
                                                                        Seattle, Washington  98101-1688

405, 410, 698 P.2d 609, 612 (1985) (dictum); *cf. Cartozian, Inc. v. Ostruske-Murphy, Inc.,* 64 Wn.2d 1, 5-6, 390 P.2d 548, 551 (1964) ("While any breach will give rise to a cause of action for damages, a breach does not become cause for repudiation until it is, under all of the circumstances surrounding the contract, so material as to amount to a substantial or total failure of consideration.")

In determining the materiality of an alleged breach, Washington uses the five-part test of the RESTATEMENT (2D) OF CONTRACTS § 241 (1981), requiring consideration of the following circumstances:

> (a)    the extent to which the injured party will be deprived of the benefit which he reasonably expected;
>
> (b)    the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
>
> (c)    the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
>
> (d)    the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
>
> (e)    the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*See Bailie Comm'ns, Ltd. v. Trend Business Systems,* 53 Wn.App. 77, 82-83, 765 P.2d 339, 343-44 (1988). The ultimate issue to which these circumstances are relevant is whether the breach was "one serious enough to justify the other party in abandoning the contract . . . one that substantially defeats the purpose of the contract." *Park Avenue Condo. Owners Ass'n,* 117 Wn.App. at 383, 71 P.3d at 698 (internal quotes omitted).

Although determining whether a breach was "material" is ordinarily an issue of fact, the question can and should be decided on summary judgment if the underlying facts are undisputed and only the legal conclusion to be drawn from those facts remains in doubt. *Fantasy, Inc. v. Fogerty,* 984 F.2d 1524, 1530 (9th Cir. 1993) (discussing the same test under California law, and affirming summary judgment on the ground that the alleged breach was not material), *rev'd on*

MICROSOFT'S MOTION FOR SUMMARY JUDGMENT - 18
(CV05-1013JLR)
SEA 1926213v3 0025936-000646_

Davis Wright Tremaine LLP
LAW OFFICES
2600 Century Square · 1501 Fourth Avenue
Seattle, Washington 98101-1688

*other grounds*, 510 U.S. 514 (1994).[6]  In this case, the facts are undisputed because, for purposes of this motion only, Microsoft accepts all of Timeline's *factual* allegations (but not its legal characterizations or conclusions) as true.

Although Timeline alleges that it was deprived of a portion of the benefits of "Partner status" due it under the License Agreement, in *Timeline I* Timeline's CEO Charles Osenbaugh testified that these benefits had a value of $100,000 a year.  Kinkead Decl., Ex. 6 at 90:7-20.  At least some of the promised benefits were admittedly provided.  *Id.,* Ex. 2 at 24:19-20.  The amount of Timeline's damage claim for the five years at issue is therefore less than $500,000. This amount is less than 10% of the total value of the License Agreement, the rest of which was fully performed.  The alleged injury can readily be compensated in damages if Timeline can prove its allegations.

Particularly given the threatened forfeiture of the unearned portion of Microsoft's $5,000,000 license fee, no reasonable jury could find that the alleged breaches, even if true, "went to the whole," "substantially defeated the object of the contract," or were "serious enough [to] justify Timeline in abandoning the contract." *See, e.g., Fantasy, Inc. v. Fogerty,* 984 F.2d at 1530.  Timeline's remedy is an action for damages, not cancellation of the contract.  *See* A. Corbin, Corbin on Contracts, § 659 (1963) ("defendant is not justified in refusing to perform his promise if the plaintiff's failure is only partial and is such that full and just compensation can be made by the payment of money damages.").   Its damage claim should be heard in state court.

**3.      Timeline's Purported Cancellation Came Too Late.**

The third independent reason why Timeline's attempted cancellation is ineffective is that it came too late.  Mr. Osenbaugh's testimony in *Timeline I* showed that he claimed to be fully

---

[6] *See, e.g., Converse v. Zinke*, 635 P.2d 882, 887 (Colo. 1981) (a breach that a jury deemed worth ~23% of the contract was immaterial). The *Converse* court explained that the extent to which an injured party will obtain substantial benefit from the contract, as well as the adequacy of compensation in damages, should be considered in determining the materiality of failure of performance.

Davis Wright Tremaine LLP
LAW OFFICES
2600 Century Square · 1501 Fourth Avenue
Seattle, Washington  98101-1688

aware in 2000 of conduct of the sort that he now alleges to have constituted a "material breach" of the License Agreement.  Kinkead Decl., Ex. 2 at 112-113:22, 117:21-120:14, and Ex. 3 at 86:16-88:9, 90:12-91:8.  Indeed, Timeline asserted a claim of breach of the License Agreement in *Timeline I*, but voluntarily dismissed it without prejudice before trial. *Id.* at ¶ 3.  Instead, Timeline retained its status as a Microsoft "partner" and continued to receive free software under the License Agreement.  It did not try to cancel Microsoft's license until August 2006.

Under Washington law, "[f]ailure to rescind within a reasonable time of the breach is conduct indicating an election to continue the contract." *Pragers, Inc. v. Bullitt Co.*, 1 Wn.App. 575, 586, 463 P.2d 217, 223 (1969).  *Accord Clover Park District v. Dairy Prods.*, 15 Wn.App. 429, 434, 550 P.2d 47, 50 (1976).  In this case, Timeline not only failed to rescind within a reasonable time; it later expressly affirmed the contract.  Last year, in order to obtain access to confidential communications between Microsoft's counsel and ProClarity's counsel, Timeline assured this Court that the License Agreement effectively insulated Microsoft from liability even if Microsoft engaged in conduct that induced infringement of Timeline's patents: "Microsoft is not liable even if it induces its customers to infringe by using a combination not covered by the Microsoft license."  *See* Docket # 90, Plaintiff's Reply re Motion To Compel at 2 (Jan. 27, 2006).  Timeline explained that "Timeline granted Microsoft a covenant not to sue.  Thus, **Microsoft is not liable even if it induces its customers to infringe** by using a combination not covered by the Microsoft license." *Id.* (emphasis added).  Timeline prevailed on the motion.  Such assurances, given with full knowledge of the facts alleged to give a basis for cancellation, amount to an affirmance of the contract and a waiver of the right to rescind.  They limit Timeline's remedies to a claim for any damages that may be justified.  *See Weitzman v. Bergstrom*, 75 Wn.2d 693, 697, 453 P.2d 860, 863 (1969).[7]

---

[7] Timeline's statement in its prior briefing that Microsoft would not be liable if it engaged in conduct that induced others to infringe Timeline's patents directly conflicts with its current position that Microsoft *can* be liable for conduct that induces infringement.  Timeline specifically alleges that Microsoft has "induced others to infringe Timeline's patents."  Second

Davis Wright Tremaine LLP
LAW OFFICES
2600 Century Square · 1501 Fourth Avenue
Seattle, Washington 98101-1688

**F.   The Patent License Provides a Complete Defense to Claims of Patent Infringement by Microsoft.**

The License Agreement, by its terms, provides Microsoft with a complete release from all claims of direct infringement, contributory infringement, and inducing infringement, based on acts "occurring ***before, on or after*** the Effective Date of this Agreement."  Ex. B, Agreement ¶¶ 1.7, 3.2 (emphasis added).  Timeline acknowledged last year, before its attempted termination of the License, that the license had that effect.  "Microsoft is not liable even if it induces its customers to infringe by using a combination not covered by the Microsoft license."  Plaintiff's Motion To Compel at 2 (Jan. 5, 2006) (Docket # 64).

## V.  CONCLUSION

Even with Timeline's factual accusations taken as true for purposes of the Motion, its attempted termination of the License Agreement was unjustified and ineffective.

The Court should enter summary judgment in favor of Microsoft, declaring that the 1999 Patent License Agreement remains in full force and effect and that it provides a complete defense to all claims of patent infringement (including inducing infringement or contributory infringement) against Microsoft.  All such patent claims should be dismissed with prejudice.

The Court should also dismiss the contract claims and counterclaim between Microsoft and Timeline under the provisions of 28 U.S.C. § 1367(c).

The only issues that should be heard in this Court are the claims of patent infringement against ProClarity.  The impact of the License Agreement on such claims will be addressed by a later motion if necessary.

A proposed Order is submitted herewith.

---

Amended Complaint at ¶ 32, Docket # 199.  The doctrine of judicial estoppel should bar Timeline from now repudiating its earlier position.  *See Risetto v. Plumbers Local 343*, 94 F.3d 597, 600-05 (9th Cir. 1996).

MICROSOFT'S MOTION FOR SUMMARY JUDGMENT - 21
(CV05-1013JLR)
SEA 1926213v3 0025936-000646_

Davis Wright Tremaine LLP
LAW OFFICES
2600 Century Square · 1501 Fourth Avenue
Seattle, Washington  98101-1688

DATED this 18th day of January, 2007.

Davis Wright Tremaine LLP
Attorneys for Defendant
Microsoft Corporation

By _____

Marvin L. Gray, Jr.
WSBA #5161
E-mail: montygray@dwt.com
Telephone: (206) 628-7665
Cassandra L. Kinkead
WSBA #22845
E-mail: cassikinkead@dwt.com
Telephone: (206) 628-7695
2600 Century Square
1501 Fourth Avenue
Seattle, WA 98101-1688
Fax: (206) 628-7699

Merchant and Gould
Attorneys for Defendant Microsoft
Corporation
Richard C. Siefert, WSBA #8339

Of Counsel:
T. Andrew Culbert, WSBA #35925
Associate General Counsel
Microsoft Corporation
Redmond, Washington

MICROSOFT'S MOTION FOR SUMMARY JUDGMENT - 22
(CV05-1013JLR)
SEA 1926213v3 0025936-000646_

## PROOF OF SERVICE

I hereby certify that on January 18, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Parker C. Folse III
pfolse@susmangodfrey.com

Robert E. Rohde
brohde@rohdelaw.com

DATED this 18th day of January, 2007.

Davis Wright Tremaine LLP
Attorneys for Defendant
Microsoft Corporation

By /s/ Cassandra L. Kinkead
Cassandra L. Kinkead
WSBA #22845
Davis Wright Tremaine LLP
2600 Century Square
1501 Fourth Avenue
Seattle, WA 98101-1688
Telephone: (206) 628-7695
Fax: (206) 628-7699
E-mail: cassikinkead@dwt.com

MICROSOFT'S MOTION FOR SUMMARY JUDGMENT - 23
(CV05-1013JLR)
SEA 1926213v3 0025936-000646_

Davis Wright Tremaine LLP
LAW OFFICES
2600 Century Square · 1501 Fourth Avenue
Seattle, Washington  98101-1688

**EXHIBIT A**

MICROSOFT CORPORATION
SOFTWARE DEVELOPMENT AND LICENSE AGREEMENT

THIS SOFTWARE DEVELOPMENT AND LICENSE AGREEMENT (the "Agreement") is made and entered into on this _____ day of June, 1995 (the "Effective Date") by and between TIMELINE INC. ("DEVELOPER"), a Washington corporation, and MICROSOFT CORPORATION ("MS"), a Washington corporation.

## RECITALS

WHEREAS, MS is engaged in the business of developing, acquiring and licensing computer software products, and desires to obtain from DEVELOPER all of the rights hereinafter granted to MS for the software programs described below, and

WHEREAS, DEVELOPER is engaged in the business of developing computer software, and desires to develop the Base Code described below for MS as a work for hire, and to develop MDB Writer software and grant to MS non-exclusive, worldwide, perpetual rights to such software on the terms and conditions hereinafter set forth,

NOW, THEREFORE, in consideration of the foregoing recitals and the covenants and conditions hereinafter set forth, the parties hereto agree as follows:

## AGREEMENT

1.   DEFINITIONS

The following terms shall have the following meanings whenever initially capitalized herein:

(a)   Base Code.  The "Base Code" developed hereunder and referred to herein shall consist of the XL Wizard ("XL Wizard"), templates ("Templates"), filters ("Filters") and tool kit software ("Tool Kit"), including technical documentation therefor and all modifications and enhancements thereto which DEVELOPER shall develop and deliver under this Agreement.  The Base Code and its various components are further described and specified in Exhibit A, which is attached hereto and incorporated herein by reference, and which Exhibit A may be amended and supplemented by mutual written agreement of the parties.

(b)   MDB Writer.  The "MDB Writer" developed and licensed hereunder and referred to herein shall mean software that creates a Microsoft® Access® data file based on accounting data converted from data files created by an accounting software product, as well as technical documentation therefore and any modifications and enhancements thereto which DEVELOPER shall develop and deliver under this Agreement.  The initial version of the MDB Writer is further described and specified in Exhibit A.

CONFIDENTIAL-
ATTORNEY'S EYES ONLY

MSFT-SGNT 000132

(c) Program Error.  A "Program Error" shall mean a defect in the Base Code or any component thereof or the MDB Writer which prevents such software from performing in accordance with the specifications described in Exhibit A (or as later amended or supplemented by mutual written consent of the parties) and in a commercially acceptable manner, based on industry standards. A "Priority Level 1" Program Error means a bug which causes the Base Code or the MDB Writer to crash or otherwise causes a non-recoverable condition (e.g., a system hang, data loss, general protection fault, or database corruption.)  A "Priority Level 2" Program Error means that a material feature or function of the Base Code or the MDB Writer is not performing correctly, or that the Base Code or the MDB Writer has become de-stabilized, and there is no convenient workaround.  A "Priority Level 3" Program Error means that a minor component of the Base Code or the MDB Writer is not performing correctly, but use of the Base Code or the MDB Writer is not interrupted.

(d) Source Code.  "Source Code" shall mean software code in human-readable, high-level language form, and shall include both human readable (listings) and machine readable (source file) forms, all tools and documentation needed to build a given software program, and all flow charts, programmer comments and design specifications for the software program.

(e) Object Code.  "Object Code" shall mean machine executable software code in binary format.

(f) Accounting Assistant.  "Accounting Assistant" shall mean any accounting assistant software program created, marketed or licensed by MS which accounting assistant creates financial and sales reports from data generated by a Microsoft or third party accounting application software package and which accounting assistant is used in conjunction with Microsoft® Excel®, any successor MS product to Microsoft® Excel®, or any other MS product now existing or hereafter invented which incorporates spreadsheet functionality (such as, but not limited to, Microsoft Office or successor products).

(g) Competing Product.  A "Competing Product" shall mean a software product with functionality substantially equivalent to that of an Accounting Assistant, and targeted at the lower-end, small-business accounting software market.  Competing Products include but are not limited to (i) other accounting assistants targeted at the lower-end, small-business accounting software market for Microsoft Excel, Office, or successor products; and accounting assistantss targeted at the lower-end, small-business account software market for non-MS spreadsheet programs or products which incorporate spreadsheet or database functionality.

(h) MetaView.  "MetaView" shall mean DEVELOPER's financial and management reporting system software, which software is designed to integrate to one or more existing accounting and financial data sources to consolidate financial information from these sources for the purpose of providing reporting, budgeting and/or consolidation capabilities.  MetaView is designed to run exclusively in the Microsoft® Windows® environment, and in addition to providing financial reporting directly, may be used and integrates with Microsoft® Office® applications to provide additional analysis and reporting.

2

MSFT-SGNT 000133

CONFIDENTIAL-
ATTORNEY'S EYES ONLY

(i) First Shipment. The "First Shipment" shall mean MS' first shipment of an Accounting Assistant to an end user for revenue bearing purposes.

2.    TESTING AND ACCEPTANCE

(a)    Development and Delivery of the Base Code and the MDB Writer. DEVELOPER and MS have agreed on the development and delivery schedule for the Base Code and the MDB Writer set forth in Exhibit B, which Exhibit is incorporated herein by reference and which is subject to amendment only upon the mutual written agreement of the parties. Any changes to the specifications in Exhibit A or the schedule in Exhibit B must be approved in writing by each party. DEVELOPER shall deliver the Base Code and the MDB Writer deliverables to MS in Source Code and Object Code form.

(b)    DEVELOPER's Testing of the Base Code and the MDB Writer. DEVELOPER shall be responsible for thoroughly testing all aspects of the Base Code and MDB Writer, including without limitation by ensuring all reports are accurate by comparing known correct reports to reports generated by the Base Code and MDB Writer for all supported accounting applications; ensuring that all VBA code and dialogs work and look as described in the specifications and that all boundary conditions are tested; testing to ensure milestone deliverables match the behavior described in the specifications and test boundary conditions; and identifying any and all Program Errors in the milestone deliverables. To provide MS with information on the nature, extent, and results of such testing, DEVELOPER shall deliver to MS a Testing Release Document (TRD) with each delivery of software code. Each TRD shall identify what tests DEVELOPER has performed, identify all outstanding Program Errors, identify Program Errors that have been fixed since the last TRD, identify those Program Errors previously discovered and communicated by MS and their status, and all such other information as is reasonably requested by MS.

(c)    MS' Testing of the Base Code and the MDB Writer. Upon receipt by MS of code complete versions of each milestone deliverable described in Exhibit B, MS shall perform acceptance testing of such deliverable, and shall provide DEVELOPER with reports on any Program Errors identified by MS in the deliverable via electronic mail or facsimile. If MS identifies Program Errors of Priority Level 1, 2 or 3 in a deliverable, then DEVELOPER shall promptly correct and redeliver the deliverable and in any event shall complete corrections and redeliver final code for such deliverable by the end of the relevant quality assurance period defined in Exhibit B.

(d)    DEVELOPER's Failure to Deliver or Correct the Base Code and/or the MDB Writer. If DEVELOPER fails to deliver any deliverable for the Base Code or MDB Writer by the relevant deadline specified in Exhibit B, or if MS, pursuant to this Section 5, reports any Program Errors of Priority Level 1, 2 or 3 and DEVELOPER fails to correct such Program Errors within five (5) business days (or another time period as mutually agreed by the parties) from receiving such report, then MS as its sole remedy shall have the option of doing any one of the following: (i) MS may retain the Base Code or MDB Writer at an equitable adjustment in the payments otherwise owed to DEVELOPER, as may be agreed by the parties; (ii) the relevant quality

MSFT-SGNT 000134

CONFIDENTIAL-
ATTORNEY'S EYES ONLY

assurance period may be extended, as may be agreed by the parties; (iii) in the case of Base Code, MS may perform the necessary development or Program Error correction work itself, at DEVELOPER's expense; or (iv) MS may terminate this Agreement, in which case MS shall destroy or return to DEVELOPER all copies of the Base Code or MDB Writer and certify that it has not retained any such copies, and DEVELOPER shall refund to MS all license fees made by MS hereunder, and each party shall thereafter have no obligation to the other except as specifically provided herein.  At such time as MS has accepted commercial release versions of both the Base Code and the MDB Writer, MS shall be deemed to have accepted the Base Code and the MDB Writer for purposes of this Agreement.

   (e)    Joint Ownership of Specifications.  The specifications set forth in Exhibit A for the Base Code and modifications to the MDB Writer have been jointly created by the parties and shall be jointly owned by them, notwithstanding any termination of this Agreement.  In the event of termination of this Agreement, both MS and DEVELOPER shall be entitled to exercise all right, title and interest in such specifications for any purpose whatsoever without authorization from or obligation (including without limitation any reporting or payment obligation) to the other.

3.    OWNERSHIP OF THE BASE CODE; LIMITED LICENSE TO DEVELOPER TO THE FILTERS

   (a)    MS' Ownership of the Base Code.  The Base Code, including all patents, copyrights, trade secrets, trademarks and other proprietary rights and intellectual property rights in or based on such Base Code, has been specially ordered and commissioned by MS. DEVELOPER agrees that the Base Code shall be deemed to be a "work for hire" as that term is defined under U.S. copyright law, and as a result, MS shall own all copyrights in the Base Code. To the extent that the Base Code does not qualify as a work for hire under applicable law, and to the extent that the Base Code is subject to copyright, patent, trade secret, or other proprietary right protection, DEVELOPER hereby sells, assigns, transfers and conveys to MS, its successors and assigns, irrevocably and perpetually, all right, title, and interest in and to the Base Code, including without limitation all copyrights in the same, and in all renewals and extensions of the copyrights that may be secured under the laws now or hereafter in force and effect in the United States of America or in any other country or countries.  To the extent not already assigned, DEVELOPER further hereby waives any moral rights or similar rights it may have with respect to the Base Code.  At MS' request, DEVELOPER shall execute and deliver such instruments and take such other actions as may be required to confirm the ownership provisions of this Section 3(a).

   (b)    License Grant to DEVELOPER to the Filters.  At such time as MS has received any required approvals from the third parties that are providing the file format information for the Filters, MS shall grant to DEVELOPER a worldwide, non-exclusive, personal, non-transferable, non-assignable, royalty free license to use, reproduce, modify and distribute the Filters contained in the Base Code, in Source Code and Object Code forms, for any purpose other than the development, production, distribution or licensing of a Competing Product.  MS agrees to negotiate in good faith with such third parties in order to obtain any required permissions and further agrees to promptly inform DEVELOPER when such approval has been received and to

4

MSFT-SGNT 000135

CONFIDENTIAL-
ATTORNEY'S EYES ONLY

execute a written confirmation of the aforementioned license grant as to each such Filter for which approval has been obtained.

4.    DEVELOPER'S LICENSE GRANT TO MS FOR THE MDB WRITER

Effective upon MS' acceptance of the MDB Writer pursuant to Section 2, DEVELOPER shall be deemed to have granted to MS a non-exclusive, worldwide, perpetual license to use, reproduce, manufacture, distribute, transmit, sell, rent or lease the MDB Writer, in whole or in part and in conjunction with other software or on a stand-alone basis, in Object Code form and to sublicense any and all such rights to third parties, including the right to grant further sublicenses. By way of explanation, but not limitation, MS may (i) offer the MDB Writer or any component thereof on a stand-alone basis, (ii) offer the MDB Writer or any component thereof with any MS product (for example, but not by way of limitation, an Accounting Assistant), or (iii) offer the MDB Writer or any component thereof to any purchaser of an MS product, by means for example of a coupon offer made at the point of purchase of an MS product or placed in the retail box of an MS product, or by direct mail offer to registered users of any MS product, or by including the MDB Writer or any component thereof in a retail unit including other accounting products; or (iv) by sublicensing the reproduction and distribution of the products or promotions contemplated in (i), (ii) or (iii) to an Original Equipment Manufacturer ("OEM").

5.    LIMITED LICENSE TO DEVELOPER FOR THE BASE CODE

    (a)    License Grant.    MS grants DEVELOPER a non-exclusive, personal, nontransferable, nonassignable, royalty free, worldwide license, for as long as MS continues to market an Accounting Assistant which includes the Base Code or the MDB Writer, to use, reproduce, manufacture, distribute, and license the Base Code, in conjunction with the MDB Writer, as a component of DEVELOPER's MetaView product. MS will provide DEVELOPER with a copy of the Base Code, as included in the Accounting Assistant, in Object Code form within thirty (30) days after the First Shipment and within thirty (30) days of any subsequent first shipment by MS for revenue bearing purposes of each substantially modified version of the Base Code. DEVELOPER shall not be entitled to market, distribute or license the Base Code on a stand-alone basis or as part of any product other than the MetaView product (and, in such case only, in conjunction with the MDB Writer).

    (b)    Copyright Notices.    In any copy of MetaView distributed by DEVELOPER in which DEVELOPER includes the Base Code, DEVELOPER shall include a copyright notice in favor of MS in the same location as DEVELOPER's copyright notices, such notice to be in the form reasonably specified by MS.

    (c)    No Trademark License.    The license granted in this Section 5 shall not be deemed to include or imply any license to use MS trademarks or trade names associated with the Accounting Assistant. MS agrees to consider in good faith any request by DEVELOPER for a separate limited license to use such MS trademarks or trade names in conjunction with DEVELOPER's distribution of Base Code, in conjunction with the MDB Writer, in the MetaView product

MSFT-SGNT 000136

CONFIDENTIAL-
ATTORNEY'S EYES ONLY

(d)    Product Support. DEVELOPER shall perform all customer support for MetaView and any product which includes the Add-in Product in MetaView pursuant to this Section 5. DEVELOPER shall clearly and prominently indicate its sole responsibility for such support in the end user documentation, and any support information included in the packaging or end user license agreement, for each copy of MetaView which includes or is distributed in conjunction with the Add-in Product.

(e)    Reporting Obligations. DEVELOPER hereby agrees to provide Microsoft within thirty (30) days of the end of each calendar quarter during the term the license grant in Section 5(a) is in effect, with a written report detailing the quantities of DEVELOPER's shipments of the Accounting Assistant.

6.    SUPPORT

(a) Documentation. DEVELOPER shall deliver to MS technical reference documentation for the Base Code and the MDB Writer in conjunction with its delivery of the commercial release candidate versions thereof pursuant to Exhibit B.

(b)    Primary Support for the Base Code and the MDB Writer. Except as specifically provided in Sections 6(c) and 7 below, MS shall be responsible for end user support of the Base Code and the MDB Writer and modifications thereof which it distributes or licenses.

(c)    Back-up Support for the Base Code and the MDB Writer. Following MS' acceptance of all deliverables hereunder, DEVELOPER shall provide back-up support to MS concerning the Base Code and the MDB Writer for as long as MS shall continue to market an Accounting Assistant containing the Base Code or MDB Writer and as long as Microsoft elects to continue maintenance as described in Section 7. Qualified personnel of DEVELOPER shall, pursuant to such obligation, respond to telephone or electronic mail questions from MS product support staff within twenty-four (24) hours after MS sends such questions. MS shall be entitled to include end users of the Base Code or the MDB Writer, or derivative works thereof, in three-way conversations with DEVELOPER's personnel and MS personnel where MS reasonably believes this approach would lead to more efficient problem resolution. DEVELOPER's charges to MS for back-up support services shall be included in the yearly maintenance fee described in Section 8(c).

(d)    Training. Upon request by MS, DEVELOPER shall provide up to four (4) on-site training at MS and to MS' technical support personnel concerning the Base Code and the MDB Writer, subject to mutual agreement on the date(s) of such training and to MS' reimbursement of DEVELOPER's reasonable travel, lodging, and other out of pocket expenses of providing such training. DEVELOPER shall make qualified personnel reasonably available to provide additional training on a time and materials basis upon request by MS.

(e)    No Maintenance for the MS Versions of the Base Code or Add-In Product. Nothing in this Agreement shall obligate MS in any way to provide maintenance or support to

MSFT-SGNT 000137

CONFIDENTIAL-
ATTORNEY'S EYES ONLY

DEVELOPER for any version of the Base Code or Add-In Product licensed or otherwise distributed by DEVELOPER hereunder.  DEVELOPER hereby assumes all maintenance and support obligations with respect to its exercise of license rights to the Accounting Assistant.

7.    MAINTENANCE

DEVELOPER shall provide maintenance for the Base Code and MDB Writer at no additional charge for a period of ninety (90) days following the First Shipment.  Such maintenance shall include correction of Program Errors as required by DEVELOPER's warranty under Section 14(e) and back-up support as described in Section 6(c).  In addition, notwithstanding anything to the contrary in Section 8(c), DEVELOPER shall respond at no charge to all MS telephone support requests concerning the Base Code and MDB Writer during the first thirty (30) days following the First Shipment.  Beginning ninety (90) days after the First Shipment, MS shall be entitled to obtain maintenance in consideration of the fee described in Section 8(c). DEVELOPER's maintenance duties and MS' obligation to pay compensation shall renew automatically for successive one (1)-year periods unless MS gives DEVELOPER notice of its election not to renew such maintenance rights prior to the end of a given one (1)-year period.

8.    PAYMENTS AND INVOICES

(a)  For the Base Code.  MS shall pay DEVELOPER one hundred seventy-five thousand dollars (US$175,000.00) for development and delivery of the Base Code, with such fee to be paid in increments at the following milestones:

i.  US$87,500.00 after MS' execution of this Agreement;

ii.  US$43,750.00 after delivery of the beta version of the Base Code;

iii.  US$43,750.00 after MS' acceptance pursuant to Section 2 of a final commercial release candidate of the Base Code; and

In addition, in the event DEVELOPER delivers to MS a final commercial release candidate of the Base Code which meets the acceptance criteria of Section 2 on or before the deadline identified in Exhibit B, MS shall pay DEVELOPER a one-time US$17,500.00 bonus.

(b)  For the MDB Writer.  MS shall pay DEVELOPER a one-time, flat fee royalty of one hundred twenty-five thousand dollars (US$125,000.00) for all rights licensed hereunder to the MDB Writer.

(c)    For Maintenance.  In the event MS elects to obtain maintenance as described in Section 7, then beginning ninety (90) days after First Shipment, MS shall pay DEVELOPER eighteen thousand seven hundred fifty dollars (US$18,750.00) per year for each year of maintenance elected by MS.  Any increase in the charge for maintenance after the first (1st) year shall be limited to no more than the corresponding annual increase in the U.S. Department of Labor Consumer Price Index.  In the event this Agreement is terminated, DEVELOPER shall

7

MSFT-SGNT 000138

CONFIDENTIAL-
ATTORNEY'S EYES ONLY

refund to MS a pro-rata share of the maintenance fee already paid by MS (if any) for the part of the then-current maintenance term remaining after termination. The foregoing maintenance fee shall cover, as part of the maintenance services described in Section 7, up to fifteen (15) free support calls (as described in Section 6(c)) per month. MS shall pay for any support requests beyond such fifteen (15) monthly calls at a rate of one hundred dollars (US$100.00) per hour. Nothing herein shall supersede MS' right to receive thirty (30) days of unlimited free support calls as described in Section 7.

(d)   Invoices. DEVELOPER shall be entitled to submit invoices for the development fee payments after each of the milestones listed in Section 8(a) above, and an invoice for the royalty after MS' acceptance of a final version of the MDB Writer. DEVELOPER may submit an invoice for the annual maintenance and support fee ninety days after the First Shipment, and each anniversary thereafter. DEVELOPER may submit invoices for additional support fees after the end of each month in which the number of support calls exceed fifteen (15). MS shall remit payment under all undisputed invoices on a net basis within thirty (30) days after receipt of invoice.

9.   **MDB WRITER SOURCE CODE AND MODIFICATIONS THEREOF**

(a)   Use of Source Code. Upon receipt of the Source Code for the MDB Writer, MS shall open and review the Source Code to verify its contents only. After such verification, MS and its employees and agents shall not further open or review the Source Code, except in the event that either (i) DEVELOPER should become insolvent or cease to carry on business, and the business of DEVELOPER is not continued by a receiver or trustee or assignee, (ii) MS requests modifications to the MDB Writer under Section 9(b) below and DEVELOPER refuses to make such modifications, or (iii) MS requests modifications under Section 9(b) and DEVELOPER is willing to make such modifications only for a price or on a work schedule which MS in good faith determines is unreasonable in light of industry standards for comparable work. In the event of any of the foregoing, MS shall have the right to open and review the Source Code and to: (i) use, modify and create derivative works thereof in both Source Code and Object Code forms; (ii) reproduce, manufacture, distribute, transmit, sell, rent or lease the MDB Writer and derivative works thereof, in whole or in part and in conjunction with other software or on a stand-alone basis, in Object Code form; and (iii) to sublicense any and all the rights in (i) and (ii) to third parties, including the right to grant further sublicenses. The foregoing rights shall be on a worldwide, non-exclusive, royalty-free, fully-paid, perpetual and assignable basis. Upon written request, MS shall license back to DEVELOPER on a worldwide, non-exclusive, perpetual, personal and nonassignable basis any modifications which MS develops using the MDB Writer Source Code pursuant to this Section 9(a), in both Source Code and Object Code forms. The foregoing license grant to MS modifications to DEVELOPER for the MDB Writer shall apply only to modifications for which MS initially budgets no more than Three Hundred Thousand Dollars (US$300,000.00) (taking into account expenditures of internal resources and development or license fees paid to third parties, all of which must be reasonable in light of industry standards for comparable work). The foregoing license grant shall further be contingent on DEVELOPER's continuing to perform its other obligations under this Agreement.

MSFT-SGNT 000139

CONFIDENTIAL-
ATTORNEY'S EYES ONLY

(b) <u>DEVELOPER's Right of First Refusal as to the Creation of Modifications to the Source Code</u>. If MS wishes to modify the MDB Writer in order to customize it for a specific end user or to develop an improved version of the MDB Writer for a future version of an Accounting Assistant, MS shall first offer DEVELOPER in writing the opportunity to perform such modifications at such development fees and on such delivery schedule as the parties may mutually agree in writing. DEVELOPER shall have ten (10) business days to respond to such a request for proposal by MS, after which DEVELOPER and MS shall negotiate in good faith to conclude a further development agreement on reasonable terms. However, if DEVELOPER (i) refuses to perform the modifications, (ii) does not respond to an opportunity of which MS notifies it within the ten (10) business day period described above, or (iii) demands a price or delivery schedule for the modifications that MS in good faith determines is unreasonable in light of industry standards for comparable work, MS may open, review and use the Source Code for the MDB Writer as set forth in Section 9(a) and proceed to make the modifications itself or with other contractors.

(c) <u>ISVs</u>. If an independent software vendor ("ISV") (including without limitation any ISV that competes with DEVELOPER in any manner) requests modifications to the MDB Writer so that the ISV may distribute the MDB Writer as part of its software product, MS and DEVELOPER will negotiate in good faith with the ISV to determine who will perform the modifications, at what fee, and who will own or license the resulting code. Any such ISV modification to MDB Writer requires the written agreement of both MS and DEVELOPER. DEVELOPER shall cooperate in good faith in order to provide such ISV with requested modifications even if the ISV is a competitor of DEVELOPER in any market for software.

(d) <u>Optional Right for MS to Acquire by Payment a Source Code License to the MDB Writer</u>. Notwithstanding anything to the contrary in this Agreement, MS shall have the right to acquire from DEVELOPER at any time, upon payment to DEVELOPER of the appropriate license fee described herein, a worldwide, non-exclusive, royalty-free, fully-paid, perpetual and assignable license to: (i) use, modify and create derivative works thereof in both Source Code and Object Code forms; (ii) reproduce, manufacture, distribute, transmit, sell, rent or lease the MDB Writer and derivative works thereof, in whole or in part and in conjunction with other software or on a stand-alone basis, in Object Code form; and (iii) to sublicense any and all of the rights in (i) and (ii) to third parties, including the right to grant further sublicenses. In the event MS elects to exercise such right within the first (1st) year following First Shipment, MS shall pay a one-time license fee of One and One Half Million Dollars (US$1,500,000.00). In the event MS elects to exercise such right within the second (2nd) year following First Shipment, MS shall pay a one-time license fee of Seven Hundred and Fifty Thousand Dollars (US$750,000.00). In the event MS elects to exercise such right during the third (3rd) year following First Shipment, MS shall pay a one-time license fee of Three Hundred and Seventy Five Thousand Dollars (US$375,000.00). Thereafter, in the event MS elects to exercise such right, the parties shall negotiate in good faith an appropriate one-time license fee which shall not in any event exceed Three Hundred and Seventy Five Thousand Dollars (US$375,000.00) and which is anticipated to decline to reflect additional elapsed time. Upon any exercise by MS of such option, MS shall be entitled to use the Source Code it holds pursuant to Section 9(a) for the foregoing purposes.

MSFT-SGNT 000140

CONFIDENTIAL-
ATTORNEY'S EYES ONLY

10.   LOCALIZATION.

At MS' request, DEVELOPER shall localize the Base Code or the MDB Writer for particular languages or nations for such development fees and on such a delivery schedule as the parties mutually agree in writing.

11.   NONCOMPETE.

For as long as MS continues to market an Accounting Assistant containing the Base Code or the MDB Writer, DEVELOPER shall not, directly or indirectly, develop, license, distribute or otherwise market any Competing Product.  During the same period, DEVELOPER shall not license or otherwise transfer to a third party for further licensing, sublicensing, marketing, distribution or sale any modified version of the MDB Writer or software with similar functionality to the MDB Writer for use in conjunction with or as a component of a Competing Product.  The restrictions on DEVELOPER in this Section 11 shall not apply to any product which requires the user also to have licensed an Accounting Assistant containing the Base Code or the MDB Writer.

12.   DEVELOPER'S RIGHT TO DISTRIBUTE THE BASE CODE IN THE EVENT MS CEASES TO MARKET THE ACCOUNT ASSISTANT

If MS ceases to market an Accounting Assistant which includes the Base Code and/or the MDB Writer, then upon DEVELOPER's request MS will grant DEVELOPER a royalty-free, personal, worldwide, non-exclusive, non-assignable license to use, manufacture, distribute, transmit, sell, rent or lease copies of the version of the Base Code then being distributed and licensed by MS.  Such license shall be without warranty of any kind, including without limitation any express or implied warranties, any statutory implied warranties of merchantability, fitness for a particular purpose, or title, and any other obligations or liabilities for the Base Code.  Such license will not authorize DEVELOPER to use any trade names or trademarks under which MS marketed Base Code, MDB Writer, Accounting Assistant, or any portion or prior version thereof.  In conjunction with such license, MS will deliver to DEVELOPER the names and addresses of users of the Accounting Assistant who have registered with MS, and MS will also deliver any copies of the Source Code of the MDB Writer still held by MS.

13.   PRODUCT MARKETING

(a)  MS' Marketing Discretion.  Subject to the license grant for MDB Writer provided in Section 3, MS shall at all times have the sole discretion to set and determine all terms and conditions of marketing, distribution and licensing of all MS products which include the Base Code or the MDB Writer, or portions or modifications thereof (for example, the Accounting Assistant), including without limitation the price, position, distribution channels, and names of such MS products.  MS may distribute such MS products through distribution channels found appropriate in MS' sole discretion, which may but shall not necessarily include any of MS' existing distribution channels.  NO PROVISION OF THIS AGREEMENT SHALL BE DEEMED TO REQUIRE MS TO BEGIN OR TO CONTINUE LICENSING OR MARKETING OF ANY

MSFT-SGNT 000141

CONFIDENTIAL-
ATTORNEY'S EYES ONLY

KIND AS TO ANY MS PRODUCT CONTAINING THE BASE PRODUCT OR THE MDB WRITER, INCLUDING WITHOUT LIMITATION THE ADD-IN PRODUCT.

(b) <u>Announcements</u>. If there is a launch event for the Accounting Assistant, DEVELOPER's work will be acknowledged at such event. If the Accounting Assistant is marketed in a package separate from Microsoft Excel, Microsoft Office, or any other MS product incorporating spreadsheet or database functionality, DEVELOPER may request that MS include a flyer describing DEVELOPER's products in the Accounting Assistant package, provided that DEVELOPER shall pay or reimburse MS promptly upon request for all printing costs for such flyer plus the then-current standard per-copy insertion charge. Also, if the Accounting Assistant is marketed packaged and separately as described above, MS agrees to recognize DEVELOPER's development of the Base Code and MDB Writer in the "about box" of the Accounting Assistant, and in the data sheet concerning the Accounting Assistant. MS further agrees to issue a press release announcing the development relationship between MS and DEVELOPER. In each case discussed in this Section 13(b), MS shall have the sole discretion to determine the timing, final form and contents of any launch acknowledgment, flyer concerning DEVELOPER's products, the "about box", data sheet, and press release.

14.   <u>REPRESENTATIONS, WARRANTIES AND COVENANTS</u>

DEVELOPER hereby represents, warrants and covenants to MS as follows:

(a) That it has the full and exclusive right and power to enter into and perform according to the terms of this Agreement, and that it has the exclusive right to grant to MS the rights and title herein granted to MS.

(b) That it now owns or controls or will, at all times material hereto, own or control all right, title, and interest in and to the Base Code and MDB Writer free from any encumbrances which would in any way curtail, impair, diminish or derogate from the rights and title granted to MS herein.

(c) That the Base Code and MDB Writer as delivered to MS, including all deliverables hereunder, will not infringe any copyright, patent, trade secret or other proprietary right or intellectual property right of any third party.

(d) That, upon final delivery of the Base Code and MDB Writer, the same shall be free from known Program Errors; that all known bugs shall have been eliminated or otherwise remedied in a manner approved by MS; and that they will meet and comply with the specifications therefor.

(e) That if at any time after acceptance of the Base Code or MDB Writer any Program Errors are discovered in the Base Code or MDB Writer as delivered to MS by DEVELOPER, DEVELOPER shall use its best efforts to correct such Program Errors promptly and at its expense. DEVELOPER shall in any event deliver such corrected Base Code to MS within thirty (30) days of MS' notice to DEVELOPER of the need for corrections.

MSFT-SGNT 000142

CONFIDENTIAL-
ATTORNEY'S EYES ONLY

(f) That all services provided by DEVELOPER in connection with this Agreement will be performed in a professional manner and will be of a high grade, nature, and quality.

These representations, warranties and covenants are continuous in nature and shall be deemed to have been given by DEVELOPER at execution of this Agreement and at each stage of delivery. This Section 14 shall survive any termination or expiration of this Agreement.

## 15.   REPRESENTATIONS, WARRANTIES, AND COVENANTS OF MS

(a) <u>Representations and Warranties</u>. MS hereby represents, warrants and covenants that MS shall not license or otherwise distribute the MDB Writer except pursuant to the terms of this Agreement; provided, however, that nothing contained herein shall be construed or intended to prevent or limit MS from making or entering into any agreements with any other persons, organizations or entities with respect to activities and/or products which are like or similar to those which are the subject of or contemplated by this Agreement, including without limitation the Base Code and the MDB Writer.

(b) <u>Disclaimers</u>. MS EXPRESSLY DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED, OR STATUTORY, INCLUDING WITHOUT LIMITATION IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND TITLE, AND ALL OTHER OBLIGATIONS OR LIABILITIES ON MS' PART FOR MODIFICATIONS TO THE BASE CODE OR THE MDB WRITER, FOR THE ADD-IN PRODUCT, OR FOR ANY MS PRODUCT.

This Section 15 shall survive any termination or expiration of this Agreement.

## 16.   INDEMNITY

(a) <u>Obligation to Indemnify</u>. DEVELOPER agrees to indemnify, defend and hold MS and its successors, officers, directors and employees harmless from any and all actions, causes of action, claims, demands, costs, liabilities, expenses and damages arising out of or in connection with any claim that the Base Code or MDB Writer furnished by DEVELOPER under this Agreement constitutes an infringement of any confidential information, trade secret, patent, copyright, trademark, trade name, or other proprietary right or intellectual property right of any third party, or any other third party claim that, if true, would constitute a breach of any of DEVELOPER's representations, warranties or covenants under this Agreement. Furthermore, DEVELOPER shall indemnify, defend and hold MS and its successors, officers, director and employees harmless from any and all actions, causes of action, claims, demands, costs, liabilities, expenses and damages in any way connected to MetaView or to DEVELOPER's exercise of licensing, distribution, or other rights in the Base Code and/or MDB Writer pursuant to Sections 5 or 12 of this Agreement.

(b) <u>Indemnification Process</u>. If any action shall be brought against MS in respect to which indemnity may be sought from DEVELOPER pursuant to the provisions of this Section,

MSFT-SGNT 000143

CONFIDENTIAL-
ATTORNEY'S EYES ONLY

MS shall promptly notify DEVELOPER in writing, specifying the nature of the action and the total monetary amount sought or other such relief as is sought therein. MS shall co-operate with DEVELOPER in all reasonable respects in connection with the defense of any such action. DEVELOPER may upon written notice thereof to MS, undertake to conduct all proceedings or negotiations in connection therewith, assume the defense thereof, and if it so undertakes, it shall also undertake all other required steps or proceedings to settle or defend any such action, including the employment of counsel which shall be satisfactory to MS, and payment of all expenses. MS shall have the right to employ separate counsel and participate in the defense of any claim hereunder. DEVELOPER shall reimburse MS on demand for any payments made or losses suffered by it at any time after the Effective Date, based upon the judgment of any court of competent jurisdiction or pursuant to a bona fide compromise or settlement of claims, demands or actions, in respect to any claim or damages to which the foregoing indemnity relates.

(c) Other Obligations. If the Base Code or MDB Writer furnished hereunder is in any action held to constitute an infringement and its use is enjoined, DEVELOPER shall immediately and at its expense either (i) procure for MS the right to continue its use, distribution, licensing and marketing of the Base Code or MDB Writer; or (ii) replace or modify the Base Code or MDB Writer with a version that is non-infringing and meets the specifications set forth in this Agreement.

This Section 16 shall survive any termination or expiration of this Agreement.

17.   CONFIDENTIALITY

DEVELOPER expressly undertakes to retain in confidence all information and know-how transmitted to DEVELOPER by MS in connection with this Agreement which MS has designated as proprietary and/or confidential or that, by the nature of the circumstances surrounding the disclosure, ought in good faith to be treated as proprietary and/or confidential, and will make no use of such information and know-how except under the terms and during the existence of this Agreement. DEVELOPER's obligations under this Section shall extend to the earlier of such time as the information protected hereby is in the public domain through no fault of DEVELOPER or five (5) years following the expiration of this Agreement.   For purposes of this Section, confidential information shall not include (a) information which is or becomes publicly known through no fault of DEVELOPER; (b) information which DEVELOPER can show it has independently developed without using any MS confidential or proprietary information; or (c) information that DEVELOPER can show was already known to DEVELOPER prior to receipt of MS confidential information.

18.   GOVERNING LAW/ATTORNEYS' FEES

This Agreement shall be construed and controlled by the laws of the State of Washington, and DEVELOPER further consents to jurisdiction by the state and federal courts sitting in the State of Washington.  Process may be served on either party by U.S. Mail, postage prepaid, certified or registered, return receipt requested, or by such other method as is authorized by applicable law.

MSFT-SGNT 000144

CONFIDENTIAL-
ATTORNEY'S EYES ONLY

If either MS or DEVELOPER employs attorneys to enforce any rights arising out of or relating to this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees.

19.    NOTICES AND REQUESTS

All notices and requests in connection with this Agreement shall be deemed given as of the day they are received either by messenger, delivery service, or in the United States of America mails, postage prepaid, certified or registered, return receipt requested, and addressed as follows:

DEVELOPER:

|  |  |
|---|---|
|  | TimeLine Inc. |
|  | 3055 112th Avenue NE, Suite 106 |
|  | Bellevue, WA 98004 |
| Fax: | (206) 822-1120 |
| Attention: | Charlie Osenbaugh |
| MS: | MICROSOFT CORPORATION |
|  | One Microsoft Way |
|  | Redmond, WA  98052-6399 |
| Attention: | Excel Group Program Manager |
| with a cc to: | MICROSOFT CORPORATION |
|  | One Microsoft Way |
|  | Redmond, WA  98052-6399 |
| Attention: | Law & Corporate Affairs |

or to such other address as the party to receive the notice or request so designates by written notice to the other in accordance herewith.

20.    ASSIGNMENT

DEVELOPER may not assign or transfer this Agreement, or any portion hereof or obligation hereunder, to any third party unless MS expressly consents in advance and in writing to such assignment.  Any attempted assignment without such consent shall give MS the right to terminate, effective upon MS' giving written notice, any rights granted to DEVELOPER under Sections 3(b), 5, 9(a) and 12 of this Agreement.

MSFT-SGNT 000145

CONFIDENTIAL-
ATTORNEY'S EYES ONLY

21.    INDEPENDENT CONTRACTOR.

DEVELOPER's sole relationship to MS under this Agreement is as independent contractor and
licensor, and no partnership, joint venture, agency, franchise, or other form of agreement or
relationship is intended or created hereby.

22.    ENTIRE AGREEMENT/MODIFICATION

The parties hereto acknowledge that they have read this Agreement and understand it, and they
agree to be bound by all its terms and conditions.  They further agree that this Agreement
constitutes the entire agreement between the parties with respect to the subject matter hereof and
merges all prior and contemporaneous communications.  It shall not be modified except by a
written agreement of even date herewith or subsequent hereto signed on behalf of DEVELOPER
and MS by their duly authorized representatives.

23.    BINDING EFFECT

Subject to the limitations hereinbefore expressed, this Agreement will inure to the benefit of and
be binding upon the parties, their successors, administrators, heirs, and permitted assigns.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of
the Effective Date indicated above.

MICROSOFT CORPORATION

By _Pete Wz_____
Name (Print) _Pete Higgins_
Title _Group - VP_

TIMELINE INC.

By _John W. Calahan_____
Name (Print) _John W. Calahan_
Title _CEO - President_

CONFIDENTIAL-
ATTORNEY'S EYES ONLY

MSFT-SGNT 000146

MICROSOFT CORPORATION
SEVENTH AMENDMENT TO
SOFTWARE DEVELOPMENT AND LICENSE AGREEMENT

This Seventh Amendment ("Amendment") is entered into by and between Microsoft Corporation and Timeline, Inc. as of June ⧸ , 1999.

### Recitals

The parties have entered into a certain Software Development and License dated June, 1995, and Amendment No. 1 dated January, 1996, and Amendment No. 2 dated September 25, 1996, and Amendment No. 3 dated November 12, 1996, and Amendment No. 4 dated January 31, 1997, and Amendment No. 5 dated June 1, 1997, and Amendment No. 6 dated November 7, 1997 (collectively "Agreement"); and

The parties desire to amend certain provisions of the Agreement as partial consideration for a Patent License Agreement between Microsoft and Timeline;

The parties agree as follows:

### Amendment

1.      This Amendment shall amend and modify, to the extent of any inconsistencies, the provisions of the Agreement.  Except as expressly affected by this Amendment, the Agreement shall remain in full force and effect.

2.      Section 11 shall be stricken from the Agreement as of the execution of this Amendment and shall have no further force and effect.

IN WITNESS WHEREOF, the parties have executed this Seventh Amendment to the Agreement as of the date set forth above.  All signed copies of this Amendment to the Agreement shall be deemed originals. This Amendment does not constitute an offer by Microsoft until signed by all parties.  This Amendment shall be effective upon the execution on behalf of Timeline and Microsoft by their duly authorized representatives.

MICROSOFT CORPORATION

Signature

D. Paul Flessner
Printed Name

GM SQL Server
Title

6/3/99
Date

TIMELINE, INC.

Signature

Charles R Osenbaugh
Printed Name

Pres
Title

June 3, 1999
Date

**EXHIBIT B**

# PATENT LICENSE AGREEMENT

**AGREEMENT** dated this ⅟s⁊ day of June 1999, between Microsoft Corporation, a corporation organized and existing under the laws of the State of Washington ("Microsoft"), and Timeline, Inc., a corporation organized and existing under the laws of the State of Washington ("Timeline");

WHEREAS, Timeline warrants that it is the owner of all right, title and interest in United States Patent 5,802,511 (the "'511 Patent"), and that it has not granted and is under no obligation to grant rights in the '511 Patent to any other entity or person;

WHEREAS, Microsoft acknowledges that Timeline is the owner of all right, title and interest in the '511 Patent, and further acknowledges that Microsoft has no ownership interest in the '511 Patent;

WHEREAS, Microsoft desires to obtain a license to the '511 Patent, and Timeline is willing to grant to Microsoft such a license upon the terms and conditions hereinafter set forth;

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, Microsoft and Timeline agree as follows:

1.   Definitions

1.1   "Licensed Patent(s)" shall mean (i) United States Patent 5,802,511, for "Data Retrieval Method and Apparatus With Multiple Source Capability," issued on September 1, 1998, (ii) all other patents and patent applications filed as of the Effective Date that are owned, controlled or licensable, in whole or in part, by Timeline relating to the subject matter thereof, and (iii) all parents, divisions, continuations, continuations-in-part, reexaminations, reissues, foreign, European Patent Convention

**Confidential**

1

and Patent Cooperation Treaty counterparts (if any), and extensions of the patents and applications identified in the foregoing subsections (i) and (ii).

1.2     "Subsidiary" and "Affiliates" shall mean and include any corporation, company, joint venture, partnership, firm or other entity in which Microsoft or its Subsidiaries (as defined herein), now or hereafter, directly or indirectly, owns or controls:

      1.2.1   in the case of corporate entities, fifty percent (50%) or more of the stock or participating shares entitled to vote for the election of directors; and

      1.2.2   in the case of non-corporate entities, fifty percent (50%) or more of the equity interest with power to direct management policies of such non-corporate entities.

1.3     "Affiliate" shall also mean any of MSNBC, Dreamworks Interactive L.L.C., and MSFDC, L.L.C., if and so long as Microsoft or its Subsidiaries retain at least as much ownership and control thereof as Microsoft and its Subsidiaries have as of the Effective Date.

1.4     "Licensed Product(s)" shall mean any current or future product or service developed, manufactured, offered or distributed by or for Microsoft or its current or future Subsidiaries and Affiliates, and used, leased, licensed, marketed, sold or otherwise transferred by or for Microsoft under a trademark owned by Microsoft or its Subsidiaries or Affiliates.

1.5     "Effective Date" shall mean the later of:  (a) the date (or the last of the dates, if they are different) on which this Agreement is executed by Microsoft and Timeline, and (b) the date Microsoft pays to Timeline the sum stated in Section 4.1(a), which Effective Date will be entered in the preamble of this Agreement.

1.6     "Microsoft Licensees" shall mean those persons or entities licensed by Microsoft, or its Subsidiaries or Affiliates, including end users, distributors, dealers, customers, Original Equipment Manufacturers (OEMs), private label customers,

**Confidential**

2

independent software vendors (ISVs), value-added resellers (VARs), replicators and the like who purchase, license, acquire or otherwise obtain Licensed Product(s) from Microsoft, or its Subsidiaries, Affiliates or other Microsoft Licensees.

1.7.    "Infringement" shall include direct infringement, contributory infringement and inducement to infringe.

2.      License

2.1     Timeline hereby grants to Microsoft, and its Subsidiaries and Affiliates and Microsoft Licensees, a non-exclusive, perpetual, irrevocable, fully paid, worldwide right and license, under the Licensed Patents, to make, have made, use, sell, import, lease, license, reproduce, distribute, transfer or commercially exploit the Licensed Products.

2.2     Timeline hereby further grants to Microsoft, and its Subsidiaries and Affiliates, a limited right to grant sublicenses of the license granted to the Licensed Patents under Section 2.1 only to Microsoft's Licensees but only for the manufacture, use, sale, license, importation, lease or other distribution or transfer of Licensed Products and for the formation, use, sale, license, importation, lease or other distribution or transfer of any combination which includes a Licensed Product, provided, however, that such sublicensing rights shall not cover or extend to any third party product in such combination if that third party product itself directly infringes or contributorily infringes a Licensed Patent. No license is granted herein to expressly or impliedly sublicense any person or entity to add any software code or software product to or in combination with any Licensed Product in a way that constitutes Infringement of a Licensed Patent.

**Confidential**

3

3.    Release and Covenant

3.1    Timeline hereby irrevocably releases, acquits and forever discharges Microsoft, its Subsidiaries and Affiliates, and Microsoft Licensees, from any and all claims of infringement of the Licensed Patents, with respect to the manufacture, use, offer to sell, sale, importation, lease, licensing, reproduction, distribution, transfer, or commercial exploitation of the Licensed Products occurring before the Effective Date of this Agreement.

3.2    Timeline hereby irrevocably and without fee covenants not to sue and releases, acquits and forever discharges Microsoft, its Subsidiaries and Affiliates from any and all claims of Infringement of the Licensed Patents with respect to the manufacture, use, offer to sell, sale, importation, lease, licensing, reproduction, distribution, transfer, or commercial exploitation of the Licensed Products occurring before, on or after the Effective Date of this Agreement.  Timeline also hereby irrevocably covenants not to sue Microsoft Licensees for infringement of the Licensed Patents who use the Licensed Products as designed.

3.3    No release, acquit, covenant not to sue or discharge is granted herein to any Microsoft Licensee to add any software code or software product to or in combination with a Licensed Product in a way that constitutes Infringement of a Licensed Patent.

4.    Payment

4.1    In consideration of the license granted under Section 2, Microsoft:

     (a) shall pay Timeline, within 48 hours of the execution of this Agreement, a fully paid-up, non-refundable license fee of Five Million Dollars (US $5,000,000);

     (b) shall enter into a Seventh Amendment with Timeline to that certain Microsoft Corporation Software Development and License Agreement between

**Confidential**

4

Microsoft Corporation and Timeline, Inc. dated June 20, 1995, concurrently with the Effective Date hereof; and

(c) shall afford to Timeline "Partner" status in the Microsoft Solution Providers program (or its successors or equivalents) for a period of 60 calendar months starting June 1, 1999. As such, Timeline shall be entitled during such period to all the rights and privileges associated with such status, most particularly development software and support and marketing support as is then normal and customary for firms of such status under Microsoft's then-standard program (or its successors or equivalents).

4.2     The payment and other consideration set forth in Section 4.1 constitute the total consideration due to Timeline under this Agreement. Microsoft affirms that it will receive the benefits for which it has or will provide such consideration, regardless of whether the Licensed Patents, or any of them, are terminated or invalidated prior to their scheduled expiration.

5.     <u>Term</u>

The term of the licenses and covenants granted herein shall be from the Effective Date of this Agreement until the expiration of the last to expire rights of the Licensed Patents.

6.     <u>Confidentiality</u>

This Agreement, its terms and conditions, as well as the course and content of negotiations leading thereto, shall remain confidential and shall not be disclosed to other parties, except as may be required to carry out the terms of this Agreement, to enforce its provisions, to comply with court process or requirements of law, or as expressly permitted in this paragraph. Timeline may disclose to third parties the fact that Microsoft has taken a license under the Licensed Patents and been extended a covenant not to sue, and the nature and scope of that license and covenant. Timeline

**Confidential**

5

may also disclose the amount of payment by Microsoft to Timeline under this Agreement to the appropriate regulatory, legal or governmental agency or entity, but solely to the extent required under the securities laws or other law or regulation or in a legal proceeding pursuant to a court approved protective order with appropriate safeguards of confidentiality.  Microsoft and its respective Subsidiaries and Affiliates shall have the right (a) to refer to the existence of this Agreement, and (b) to disclose the substance thereof in response to any inquiry, whether direct or indirect, immediate or remote, by any actual or potential Microsoft Licensee.

7.     <u>Representations and Warranties</u>

7.1     Timeline represents and warrants that it has the full right and power to enter into this Agreement, and to grant all rights, licenses, releases, and covenants as set forth herein.  Timeline further represents and warrants that it is the owner of all right, title and interest in the Licensed Patents, and that it has not granted and is under no obligation to grant rights in the Licensed Patents to any other entity or person.

7.2     Timeline further warrants and represents (a) that there are no outstanding liens, conveyances, mortgages, assignments, encumbrances or other agreements inconsistent with the provisions of the foregoing license and release or with any other provision of this Agreement, or which would prevent or impair the full and complete exercise of all substantive rights, license, releases and covenants granted by Timeline to Microsoft, its Subsidiaries and Affiliates, and Microsoft Licensees, pursuant to the terms and conditions of this Agreement; (b) that this Agreement does not violate or otherwise breach any license or other agreement arising from or relating to the Licensed Patents that pre-dates the Effective Date of this Agreement; (c) that no such prior license or other agreement violates or otherwise breaches any of the rights, license, releases and covenants granted in this Agreement, and (d) that Timeline will not enter into any license or other agreement that violates or otherwise breaches any of the rights, license, releases and covenants granted in this Agreement during the full term of the Agreement.

**Confidential**

6

7.3    Timeline further warrants and represents that if any claim is made by any person or entity that this Agreement violates or otherwise breaches any license or other agreement to which Timeline or any assignee, licensee, agent or affiliate of Timeline is a party, then Timeline will indemnify Microsoft, and its Subsidiaries and Affiliates, and Microsoft Licensees, and hold them harmless from any such claim, including payment of Microsoft's and its Subsidiaries', Affiliates', and Microsoft Licensees' attorneys fees in responding to such claims.

7.4    Timeline warrants and represents that as of the Effective Date of this Agreement, it does not, to the best of its knowledge, own, control, or have the right to license or assign any rights in any patent application or patent (other than the Licensed Patents) or inventions conceived but not yet filed as a patent application which could be asserted against Microsoft, or any of its respective Subsidiaries or Affiliates, with respect to any products or services provided by, for, or to Microsoft, or its respective Subsidiaries or Affiliates.

8.    <u>Notices and Other Communications</u>

8.1    Any notice or other communication required or permitted to be made or given to either party hereto pursuant to this Agreement shall be deemed to have been given upon posting if sent to such party by registered or certified mail, postage prepaid, addressed to it at its address set forth below, or to such other address as it shall designate by written notice given to the other party in conformity with this Section 8:

In the case of Microsoft,

Associate General Counsel, Intellectual Property
Microsoft Corporation
One Microsoft Way
Redmond, WA 98052

**Confidential**

In the case of Timeline,

Charlie Osenbaugh, CEO
Timeline, Inc.
3055 112th Avenue NE
Bellevue, WA 98004

9.      Assignments

9.1     Timeline shall not assign any rights in the Licensed Patents, unless such
assignment is specifically made subject to the terms and conditions of this Agreement.
Any attempted assignment in derogation of this Agreement or this Section shall be null
and void.

9.2     This Agreement shall extend to and be binding upon the parties' successors,
estates, assigns and transferees.

10.     Applicable Law

This Agreement shall be construed, and the legal relations between the parties
hereto shall be determined, in accordance with the domestic law of the State of
Washington. The parties each consent to exclusive jurisdiction and venue in the federal
courts sitting in King County, Washington, unless no federal subject matter jurisdiction
exists, in which case each party consents to exclusive jurisdiction and venue in the
Superior Court of King County, Washington.  The parties each waive all defenses of
lack of personal jurisdiction and forum nonconveniens.

11.     Disclaimer of Agency

This Agreement shall not establish that Timeline or Microsoft is the legal
representative or agent of any other party to this Agreement.  Neither Timeline nor
Microsoft shall have the right or authority to assume, create, or incur any liability or
any obligations of any kind, express or implied, against or in the name of or on behalf
of any other party hereto except as specifically provided in this Agreement.

**Confidential**

8

Ex B
Page 8 of 10

12.    Miscellaneous

12.1    This Agreement will not be binding upon the parties until it has been signed, below, by or on behalf of each party.  No amendment or modification hereof shall be valid or binding upon the parties unless made in writing and signed as aforesaid.  This Agreement sets forth the entire agreement and understanding between the parties with respect to the subject matter hereof and merges all prior discussions between them, and none of the parties shall be bound by any conditions, definitions, warranties, understandings, or representations with respect to the Licensed Patents or any other subject matter hereof other than as expressly provided herein or as duly set forth on, or subsequent to, the date hereof in writing and signed by the party bound thereby or its duly authorized representative.  Both Microsoft and Timeline have prepared this Agreement, and no ambiguity shall be resolved against any of them by virtue of its role in drafting this Agreement.

12.2    If any provision or provisions of this Agreement shall be held to be illegal, invalid or unenforceable, the legality, validity and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

12.3    The headings of the several Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement.

**Confidential**                                                                                           9

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be signed on their behalf as of the date first above written.

MICROSOFT CORPORATION

By: _____

Title: _____

Date:     June 1, 1999

TIMELINE, INC.

By: _Charles R Osenbaugh_

Title: _Pres_

Date:     June 3, 1999

**Confidential**

10

Ex B
Page 10 of 10

**EXHIBIT C**

Honorable James L. Robart

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| TIMELINE, INC.,<br><br>       Plaintiff,<br><br>   v.<br><br>PROCLARITY CORPORATION, an Idaho Corporation, and MICROSOFT CORPORATION, a Washington Corporation,<br><br>       Defendants. | NO. CV 05-1013 JLR<br><br>**DEFENDANT MICROSOFT CORPORATION'S FIRST SET OF INTERROGATORIES WITH PLAINTIFF TIMELINE'S RESPONSES THERETO** |

TO:   DEFENDANTS AND THEIR ATTORNEYS OF RECORD

     Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Timeline, Inc. ("Timeline") hereby serves the following responses on Defendants Microsoft Corp. ("Microsoft") and ProClarity Corp. ("ProClarity").

**TERMS AND DEFINITIONS**

     In the interrogatories below, the following definitions shall apply:

1

SUSMAN GODFREY L.L.P.
1201 THIRD AVENUE, SUITE 3800
SEATTLE, WASHINGTON 98101-3000

Third, insofar as the definitions purport to require that Timeline identify "all persons involved," it renders the interrogatories vague and ambiguous and unduly burdensome.

7.      Timeline objects to Instructions 9 and 10.   First, these instructions cause the interrogatories to exceed the numerical limitation imposed by Rule 33(a).  Second, they purport to impose an undue burden.

8.      Timeline objects to the interrogatories on the ground that they exceed the numerical limit set forth in Fed. R. Civ. P. 33(a).  Notwithstanding this objection, Timeline has responded to each interrogatory, but intends to rely on it to the extent that defendants seek to serve additional interrogatories or to compel further responses to the interrogatories below.

## INTERROGATORIES

## INTERROGATORY NO. 1:

Identify specifically each paragraph of the 1999 Agreement that you allege Microsoft has breached, and separately for each such paragraph describe the acts or omissions by Microsoft that constituted or formed part of the alleged breach.

## RESPONSE:

Without waiving the general objections above, Timeline provides the following response to this interrogatory:

Para. 4.1 (b):  As material consideration under the 1999 License Agreement, Microsoft entered into a Seventh Amendment to the 1995 License Agreement.   Paragraph 1 of that Amendment, among other things, specifically reconfirmed the 1995 Agreement.    Thus, Microsoft's breach of the 1995 agreement is also a breach of the 1999 Agreement.

10

Timeline's Responses to MS's 1st Interrogatories
CV 05-1013 JLR

SUSMAN GODFREY L.L.P.
1201 THIRD AVENUE, SUITE 3800
SEATTLE, WASHINGTON 98101-3000

Ex C
Page 2 of 11

Paragraph 12 of the 1995 Agreement states, "If [Microsoft] ceases to market an Accounting Assistant which includes the Base Code and/or the MDB Writer, then upon [Timeline]'s request, Microsoft will grant [Timeline] a royalty-free, personal, worldwide, non-exclusive, non-assignable license to use, manufacture, distribute, transmit, sell, rent or lease copies of the version of the Base Code then being distributed and licensed by [Microsoft]." Microsoft also agreed to "deliver to [Timeline] the names and addresses of users of the Accounting Assistant who have registered with [Microsoft], and [to] deliver any copies of the Source Code of the MDB Writer still held by [Microsoft]."

On information and belief, Microsoft ceased to actively market the product.  Yet Microsoft failed, upon repeated, proper requests by Timeline, to provide those things specifically required by the Agreement.  Microsoft's acts and failure to act include, among other things, its refusal to properly respond to registered letters, e-mails, and phone calls responding to Timeline's requests.

Para. 4.1 (c):  A portion of this provision grants Timeline "all rights and privileges associated with such (Partner) status, most particularly … marketing support as is then normal and customary for firms of such status."  Not only did Microsoft fail to provide marketing benefits and other Partner rights that were "customary for firms of such status," but it directly and intentionally interfered with Timeline's attempts to market its products and license its patents.  Microsoft has previously confirmed in a submission to the court in *Microsoft v. Timeline* that its marketing endorsement for Timeline in licensing its patents was the most valuable of all consideration paid under Paragraph 4 of the 1999 Agreement.

11

Timeline's Responses to MS's 1st Interrogatories
CV 05-1013 JLR

SUSMAN GODFREY L.L.P.
1201 THIRD AVENUE, SUITE 3800
SEATTLE, WASHINGTON 98101-3000

Ex C
Page 3 of 11

At a minimum, marketing support includes <u>not</u> misrepresenting Timeline's patent rights under the 1999 Agreement.   Yet, Microsoft repeatedly made false statements concerning Timeline's rights, including but not limited to the following:

1.      In its Complaint in *Microsoft v. Timeline*, Microsoft stated that Microsoft was authorized to grant sublicenses to third parties for the "use, sale, license, … or transfer of any combination which includes a licensed product."  This was an implausible reading of the 1999 Agreement, and the trial court – even though it eventually entered judgment in favor of Microsoft – did not support this strained reading.  The Court of Appeals, in reversing the trial court, flatly stated in its unanimous opinion that even the construction that Microsoft argued on appeal – i.e., that Microsoft was only restricted in granting sublicenses if the third party's own product independently provided all elements of an infringement – was "impossible to reconcile" with the 1999 Agreement.  Evidence that Microsoft submitted in that litigation indicates that Microsoft repeated this misrepresentation regarding the parties' patent rights to many of its clients.

2.      Affidavits filed by Clay Young of ProClarity and Andy Hoover of Microsoft in *Microsoft v. Timeline* state that Microsoft openly advised and supported ProClarity (then named Knosys) in bidding against Timeline on jobs where it was obvious that a license of Timeline's patents would have been necessary  These affidavits indicate that Microsoft and ProClarity were willing to provide more costly and potentially less favorable products for their customers in order to push the business away from Timeline.

3.      Microsoft issued a false press release, as more fully discussed in the Response to Interrogatory No. 3 below.

12

Timeline's Responses to MS's 1st Interrogatories
CV 05-1013 JLR

SUSMAN GODFREY L.L.P.
1201 THIRD AVENUE, SUITE 3800
SEATTLE, WASHINGTON 98101-3000

Ex C
Page 4 of 11

4.     The number and extent of Microsoft's false statements to its independent software vendors ("ISVs") and the users of its products is subject to outstanding and continuing requests for discovery in this action.  Consequently, this response will be supplemented as necessary as the nature, timing, and extent of Microsoft's activities become known.

Even after Microsoft lost on appeal in *Microsoft v. Timeline*, it never retracted any of its prior false statements.  Nor did Microsoft begin to provide support to Timeline or discontinue its policy of favoring other vendors that were marketing products that infringed Timeline's patents when used in combination with Microsoft products.  The Responses to Interrogatories No. 2 and No. 3 also contain details relevant to this Interrogatory.

Para. 2.2 and Implied Duty of Good Faith:  The last sentence of Paragraph 2.2 of the 1999 Agreement states, "No license is granted herein to expressly or impliedly sublicense any person or entity to add any software code or software product to or in combination with any Licensed Product in a way that constitutes Infringement of a Licensed Patent."  Every contract in Washington also carries an implied duty of good faith and fair dealing in the performance thereof.  Microsoft expressly or impliedly sublicensed third parties to add software to or in combination with Microsoft products and to use the infringing combinations.  This conduct constitutes a breach of the last sentence of Paragraph 2.2 and the implied duty of good faith and fair dealing.

Even before Microsoft was named a defendant in this case, it agreed to pay up to $500,000 of ProClarity's defense costs in this litigation, and it is apparent that Microsoft's attorneys instructed ProClarity to plead defenses which are in direct contravention of the

13

Timeline's Responses to MS's 1st Interrogatories
CV 05-1013 JLR

SUSMAN GODFREY L.L.P.
1201 THIRD AVENUE, SUITE 3800
SEATTLE, WASHINGTON 98101-3000

Ex C
Page 5 of 11

Washington Court of Appeals decision in *Microsoft v. Timeline*. This is an open breach of the duty of good faith and fair dealing under the 1999 Agreement.

On information and belief, Microsoft has also breached its duty of good faith and fair dealing by inducing or directing ProClarity to plead that Timeline's patents are invalid when Microsoft itself is barred from doing so by its own admissions in the License Agreement. On information and belief, Microsoft has also advised ProClarity to plead that it is covered by a sublicense granted by Microsoft, even though the Washington Court of Appeals held that the 1999 Agreement cannot be construed to allow such sublicenses.

In addition, Microsoft's acts and deeds implied that ProClarity had been granted a sublicense to the Timeline patents. This implied sublicense was relied upon by ProClarity in producing products that infringe when used in combination with Microsoft products. Dennis Weyrauch stated to Mr. Osenbaugh that Microsoft personnel told him, even after Microsoft lost *Microsoft v. Timeline*, that if Timeline complained about ProClarity's products infringing Timeline's patents, then Microsoft would "take care of" Timeline.

Microsoft's continued silence, after publicly assuring potential infringers that they were protected by the Microsoft license and then losing on this point in the Washington Court of Appeals, is a violation of the 1999 License Agreement. Microsoft encouraged software vendors to add software code or products to or in combination with Microsoft products and encouraged end users to buy and use the infringing combinations by providing development support and marketing support to companies making and selling infringing combinations. Microsoft's website promoted and impliedly licensed these same infringing combinations.

Timeline's Responses to MS's 1st Interrogatories
CV 05-1013 JLR

SUSMAN GODFREY L.L.P.
1201 THIRD AVENUE, SUITE 3800
SEATTLE, WASHINGTON 98101-3000

These acts, individually and collectively, are a breach of Paragraph 2.2 of the 1999 Agreement and the duty of good faith. Timeline's Response to Interrogatory No. 2 identifies additional breaches of the 1999 Agreement.

Timeline has answered this interrogatory based on facts known to it at the time of writing. Discovery into these matters is ongoing, and Timeline reserves the right to supplement these answers as the facts develop.

**INTERROGATORY NO. 2:**

With respect to the allegations of paragraphs 16, 18, 32, 33, 35, and 38 of the Complaint, to the general effect that Microsoft breached the 1999 Agreement by encouraging and inducing "third parties" to offer and sell "infringing combinations" or "infringing unlicensed products," identify each of the "third parties" and "infringing combinations" or "infringing unlicensed products" referred to and all documents relating to such products that are in your possession, custody, or control.

**RESPONSE:**

Without waiving the general objections above, Timeline provides the following response:

On information and belief, Timeline contends that Microsoft has provided substantial marketing and development support to the following companies to create and market products that, in combination with Microsoft products, infringe Timeline's patents: ProClarity, Geac Computer Corp. Ltd., OutlookSoft Corp., Epicor Software Corp., and Olap@Work. Microsoft helped these companies develop and market infringing products, even though Microsoft had signed an Agreement with Timeline recognizing the validity of Timeline's patents and agreeing to help Timeline market and develop its products. Timeline anticipates that further discovery

15

Timeline's Responses to MS's 1st Interrogatories
CV 05-1013 JLR

SUSMAN GODFREY L.L.P.
1201 THIRD AVENUE, SUITE 3800
SEATTLE, WASHINGTON 98101-3000

Ex C
Page 7 of 11

will bring to light other companies to which Microsoft has offered such support, as well the specific ways in which Microsoft encouraged the development of and supported the marketing of the infringing products.  The Responses to Interrogatories 3 and  11 contain more examples of third parties who received marketing support as members of the Microsoft Data Warehouse Alliance.

The following persons have knowledge relevant to this response:  Bill Baxter, Steve Murchie, Andrew Culbert, Paul Flessner, and Bart Eppenauer of Microsoft; Marvin Gray, Jr. and Alan Middleton of Davis Wright Tremaine LLP; Donald Ghostlaw of OutlookSoft Corp.; Charles Osenbaugh of Timeline; Bob Lokken of ProClarity; and Dennis Ganster of Comshare (subsequently acquired by Geac Computer Corp. Ltd.)

Timeline has answered this interrogatory based on facts known to it at the time of writing.  Discovery into these matters is ongoing, and Timeline reserves the right to supplement these answers as the facts develop.

## INTERROGATORY NO. 3:

With respect to the allegations of paragraphs 16, 18, 32, 33, 35, and 38 of the Complaint, to the general effect that Microsoft breached the 1999 Agreement by encouraging and inducing third parties to develop and sell infringing combination products or unlicensed products to be used in infringing combinations, describe each act or omission by Microsoft referred to, including the identification of all persons involved and all documents relating to such act or omission.

## RESPONSE:

Without waiving the general objections above, Timeline provides the following response:

16

Timeline's Responses to MS's 1st Interrogatories
CV 05-1013 JLR

SUSMAN GODFREY L.L.P.
1201 THIRD AVENUE, SUITE 3800
SEATTLE, WASHINGTON 98101-3000

Ex C
Page 8 of 11

Eric Willgohs, in-house counsel for Broadbase Software, Inc., stated to Mr. Osenbaugh that Microsoft offered to indemnify Broadbase if it continued to sell products that were used in combination with Microsoft SQL Server and on which Timeline had filed suit claiming infringement.   Microsoft's privilege log from *Microsoft v. Timeline* appears to confirm the existence of such discussions.   While Microsoft did not, to Timeline's knowledge, actually follow through in providing an indemnify, the offer itself was an encouragement and inducement to Broadbase to infringe the Timeline patents.

Microsoft admitted in *Microsoft v. Timeline* that it provided Infinium Software, Inc. with a "sublicense" to the Timeline patents.  This occurred after Brian Ashley informed Microsoft that Infinium believed it would accept Timeline's bid to provide the product in question because of the need to have patent coverage from Timeline.   Microsoft had no right under the 1999 agreement to provide a sublicense to the patents for products which, when used in combination with Microsoft products, provided a material step in an infringement.   Microsoft had a multitude of communications with Infinium concerning Timeline's patents.

Microsoft provided its employee, David Kouchi, with an agreement to indemnify him and pay for his representation by counsel as an inducement to testify against Timeline in an effort to provide support for Sagent, Hyperion, and Clarus in their continued infringement of Timeline's patents.  As a result of this agreement and Mr. Kouchi's employment by Microsoft, he submitted false testimony to the courts in Timeline's litigation with Sagent and with Hyperion – testimony that contradicted sworn statements he had made to the United States Patent & Trademark Office.

Even before ProClarity was acquired by Microsoft, Microsoft provided substantial support to ProClarity in defending against Timeline's infringement claims.   For example,

17

Timeline's Responses to MS's 1st Interrogatories
CV 05-1013 JLR

SUSMAN GODFREY L.L.P.
1201 THIRD AVENUE, SUITE 3800
SEATTLE, WASHINGTON 98101-3000

Ex C
Page 9 of 11

Microsoft agreed to pay up to $500,000 of ProClarity's defense costs.  Also, counsel acting on behalf of Microsoft helped ProClarity prepare the defenses and counterclaims asserted by ProClarity.  These defenses and counterclaims included allegations that Microsoft was entitled to sublicense the Timeline patents to ProClarity, a statement in direct contravention of the decision by the Washington Court of Appeals in *Microsoft v. Timeline*, and that Timeline's patents are invalid, even though Microsoft acknowledged the validity of the patents in the 1999 License Agreement.

Finally, Microsoft has encouraged many companies to integrate their products to run in combination with Microsoft products through the formation and administration of the Microsoft Data Warehouse Alliance.  According to a September 1996 press release by Microsoft:

> The alliance members will cooperate with Microsoft to provide products and service to speed implementation of data warehousing solutions based on Microsoft SQL Server.  The members will also participate in joint marketing and selling activities such as seminars, trade show and advertising.

*Available at* http://www.Microsoft.com/presspass/press/1996/sept96/WHPAPTRP.asp

After the introduction of SQL Server 7.0, the alliance became heavily involved in promoting third party products intended to be used in combination with Microsoft Analysis Services.  Many of these products provided functionalities that Microsoft knew or should have known would provide a material element of an infringement of Timeline's patents when used in combination with Microsoft's products.

The following persons have knowledge relevant to this response:   Chuck Bay, Eric Willgohs, and Bob Sachs (outside counsel) of Broadbase Software, Inc.; Charles Osenbaugh of Timeline; M. Bolender, D. Petersen, S. Powers, Andrew Culbert, David Kouchi, Bill Baxter, and Kate Sako of Microsoft; Marvin Gray, Jr. and Alan Middleton of Davis Wright Tremaine LLP;

18

Timeline's Responses to MS's 1st Interrogatories
CV 05-1013 JLR

SUSMAN GODFREY L.L.P.
1201 THIRD AVENUE, SUITE 3800
SEATTLE, WASHINGTON 98101-3000

Ex C
Page 10 of 11

Brian Ashley, Matt Card, and Sue Schlener of Infinium Software, Inc.; Mike Young of ProClarity; Paul Meiklejohn of Dorsey & Whitney LLP; and Michael Swope of Woodcock Washburn LLP.

Timeline has answered this interrogatory based on facts known to it at the time of writing. Discovery into these matters is ongoing, and Timeline reserves the right to supplement these answers as the facts develop.

19

Timeline's Responses to MS's 1st Interrogatories
CV 05-1013 JLR

SUSMAN GODFREY L.L.P.
1201 THIRD AVENUE, SUITE 3800
SEATTLE, WASHINGTON 98101-3000