UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| TIMELINE, INC., <br><br> Plaintiff, <br><br> v. <br><br> PROCLARITY CORPORATION, <br><br> Defendant. | CASE NO. C05-1013JLR <br><br> ORDER DENYING SUMMARY JUDGMENT MOTION |

## I. INTRODUCTION

This matter comes before the court on a motion for summary judgment brought by Defendant ProClarity Corporation ("ProClarity") (Dkt. # 301). The court has considered the papers filed by the parties in connection with ProClarity's motion, heard the argument of counsel, and considered the supplemental briefing filed by each party. For the reasons stated below, the court DENIES the motion.

## II. BACKGROUND

The court has, on a number of prior occasions, explained the facts giving rise to this dispute (*see* Dkt. ## 173, 177, 238, 268, 279), and therefore repeats only facts necessary for the instant motion. Plaintiff Timeline, Inc. ("Timeline") is the owner of

ORDER DENYING SUMMARY JUDGMENT MOTION – 1

five patents relating to database software that automatically obtains information about the data structure of an existing data source and uses that information to design and create a new database.  As previously defined, the five Timeline patents at issue are the '511 patent, the '694 patent, the '392 patent, the '382 patent, and the '617 patent.  The '511 patent was the first to describe the invention at issue in this case; Timeline's subsequent patents are continuations of the '511 patent.[1]  In Timeline's words, the fundamental innovation described in its patents is that it discovered a way for a driver to "automatically obtain information about the logical organization of a data source, without the need for a human user to examine and analyze that data source."  Resp. at 2.  Once that information is obtained, the driver uses the "information to create a new database with a different structure that is better for performing analysis or generating reports of the data and/or which combines the data from heterogeneous sources."  *Id.*

ProClarity moves to invalidate Timeline's patents on the basis that its "invention" is actually a straightforward combination of features widely known in the art at the time it was patented.  ProClarity suggests that the only reason Timeline was able to obtain the patents was because in 1998, when the '511 patent was issued, the appropriateness of software patents had just recently been acknowledged by the Federal Circuit.  Thus, according to ProClarity, there was an absence of prior art for the patent examiner to consider in determining whether Timeline's patents were obvious to someone skilled in the art.  ProClarity argues that the dearth of patents relating to this technology in 1998 should not be interpreted to mean that the prior art did not exist, only that the prior art

---

[1]After extensive discovery and the court's order dismissing Timeline's patent infringement claims against Microsoft, Timeline narrowed the number of claims that it contends ProClarity infringed.  Timeline now alleges that ProClarity infringed claims 1, 6, 7, and 8 of the '511 patent; claims 10, 13, 14, 17, and 18 of the '392 patent; claims 2, 16, 19, 23, and 25 of the '382 patent; claims 5, 6, 7, and 8 of the '694 patent; and claims 4, 6, and 7 of the '617 patent.

ORDER DENYING SUMMARY JUDGMENT MOTION – 2

had not been patented. The prior art ProClarity relies on for purposes of this motion consists of four Microsoft products: Open Database Connectivity ("ODBC Drivers") Drivers, Microsoft Access ("Access"), Upsizing Wizard, and SQL Server 6.0 ("SQL Server"). Mot. at 2. ProClarity's argument rests upon the court's finding that the combination of these existing Microsoft products makes the Timeline patents obvious and therefore invalid.

### III. ANALYSIS

**A.    Summary Judgment Standard for Obviousness**

Summary judgment is appropriate if the evidence, when viewed in the light most favorable to the non-moving party, demonstrates there is no genuine issue of material fact. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. County of Los Angeles*, 477 F.3d 652, 658 (9th Cir. 2007). "Summary judgment is appropriate in a patent case, as in other cases, when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Nike Inc. v. Wolverine World Wide, Inc.*, 43 F.3d 644, 646 (Fed. Cir. 1994) (citations omitted). A party seeking to invalidate a patent must first overcome the presumption that the patent is valid. 35 U.S.C. § 282; *United States Gypsum Co. v. Nat'l Gypsum Co.*, 74 F.3d 1209, 1212 (Fed. Cir. 1996). To overcome this presumption, the challenging party bears the heavy burden of proving invalidity by clear and convincing evidence. *State Contracting & Eng'g Corp. v. Condotte Am., Inc.*, 346 F.3d 1057, 1067 (Fed. Cir. 2003).

One way to prove a patent's invalidity is by establishing that the patent was obvious in light of the prior art. That is, "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103. In *Graham v. John*

ORDER DENYING SUMMARY JUDGMENT MOTION – 3

*Deere*, 383 U.S. 1, 17 (1966), the Supreme Court set forth the basic factual inquiries necessary to determine whether the claims at issue are patentable as nonobvious. Specifically, in making such a determination the court looks to the (1) scope and content of the prior art, (2) differences between the prior art and the claims at issue, and (3) level of ordinary skill in the pertinent art. *Id.*; *see also KSR Int'l Co. v. Teleflex, Inc.*, __ U.S. __, 127 S.Ct. 1727 (2007). In addition to these three factors, the court may look to secondary considerations such as commercial success, long felt but unsolved needs, failure of others, etcetera, to determine the circumstances surrounding the origin of the subject matter sought to be patented. *Graham*, 383 U.S. at 17-18 (explaining that these secondary considerations might be "utilized to give light" to the obviousness inquiry).

When the content of the prior art, the scope of the patent claim, and the level of ordinary skill in the art are not in material dispute, and the obviousness of the claim is apparent in light of these factors, summary judgment is appropriate. *KSR*, 127 S.Ct. at 1745-46 (citing *Graham*, 383 U.S. at 17)). A grant of a motion for summary judgment based on obviousness is therefore appropriate where "the factual inquiries into obviousness present no genuine issue of material facts," and invalidity can be shown by clear and convincing evidence. *Ryko Mgf. Co. v. Nu-Star, Inc.*, 950 F.2d 714, 718 (Fed. Cir. 1991). In analyzing ProClarity's motion on obviousness, the court takes each of the *Graham* factors in turn.

**B.   *Graham* Factors**

   **1.   Scope and Content of the Prior Art**

The first step in any obviousness analysis is to determine the scope and content of the prior art. *See Riverwood Int'l Corp. v. R.A. Jones & Co.*, 324 F.3d 1346, 1354 (Fed. Cir. 2003). ProClarity's obviousness arguments rest upon the combination of four prior art references: ODBC Drivers, Access, Upsizing Wizard and SQL Server. Mot. at 2.

ORDER DENYING SUMMARY JUDGMENT MOTION – 4

Although Timeline disputes what was disclosed in the claimed inventions from these products it does not dispute that this art existed prior to the filing of its '511 patent. Thus, according to ProClarity, there is no genuine issue of material fact as to what products the court should consider in determining obviousness.

During oral argument on this motion, counsel for ProClarity asserted for the first time that these four Microsoft products represent only the tip of the iceberg. The combination of these products was only ProClarity's "simplest way" of showing obviousness, but that it intends to offer various other combinations of prior art at trial. August 30, 2007 Hearing Tr. (Dkt. # 365) at 33 ("Your Honor, we have a lot of other prior art that can be added and combined here."). What ProClarity essentially argues is that the scope and content of the prior art only becomes a genuine issue of material fact if the court denies its motion.

The court seriously questions ProClarity's decision to engage in this litigation tactic. The court could deny ProClarity's motion for summary judgment based solely on the fact that ProClarity creates its own genuine issue of material fact as to the scope and content of the prior art. The court will not permit ProClarity to continue to assert multiple combinations of prior art at different junctures in this proceeding. If ProClarity intends to bring a subsequent motion based on obviousness, or intends to offer evidence of, or even argue, obviousness at trial, it must first seek leave of this court. As to the briefed issues, the crux of the parties' dispute regarding the court's inquiry into obviousness is in its comparison of the prior art and the Timeline patents. The court therefore describes the scope and content of the prior art in conjunction with its analysis of their similarities to the Timeline patents.

ORDER DENYING SUMMARY JUDGMENT MOTION – 5

**2.     Differences Between the Prior Art and Timeline's Patents**

Although ProClarity broadly argues that the four prior art references stated above make each claim of the Timeline patents obvious, ProClarity's motion focuses primarily, if not exclusively, on claim 1 of the '511 patent and claim 16 of the '382 patent. Both of which, accordingly to ProClarity, can be found in combinations of the prior art. Claim 1 of the '511 provides for:

> [a] computer-implemented method usable in connection with accessing data which may be stored in either of first and second different data sources, the method comprising:
>
> a first step for providing a first driver containing program instructions configured for use in connection with said first data source in the absence of said first driver being configured for use in connection with said second data source;
>
> a second step for using said first driver to *automatically* obtain first information about the *data structure* of said first data source without the need for human analysis of the first data source by *automatically* accessing content of information stored in said first data source;
>
> using first information to *define a structure* for a first database different from said data sources wherein said first database *did not exist* before said step for using said first driver to automatically obtain first information.

(emphases added). Claim 16 of the '382 patent provides for:

> [a] computer-implemented method usable in connection with at least a first data source which stores first source data, the method comprising:
>
> using a computer to *automatically* obtain information about the *data structure* of said first data source without the need for human analysis of said first data source by accessing content of information stored in said first data source, wherein said information about the data structure includes information which can be used for *optimizing* a new database, if and when said new database is formed; and
>
> storing at least some of said information about data structure in a data storage device.

(emphases added).

ORDER DENYING SUMMARY JUDGMENT MOTION – 6

The court previously construed "content of information," to mean "information in a data source such as data values and information about structure." *See* Orders on Claim Construction (Dkt. ## 173, 238, 268). The court construed "data structure," to mean "the logical organization of data such as table[s], columns, or rows." *Id.* The parties also agreed that, at the threshold, the term "data structure" refers to the way data is organized. *Id.* Finally, the court construed "automatically," which appears in all claims, to mean "without user input or analysis." *Id.*

Timeline asserts that its patents differ from the prior art in three important respects. First, the Timeline patents are for a system that actually pulls information from the data source regarding the organization of the data and not just the data itself. Second, there is no need for human analysis, which, according to Timeline, is a claim limitation that goes far beyond the prior art. And third, the Timeline patents use the first information to define the structure for the first database different from the data source wherein the first database did not exist before the main process began. The court considers these capabilities in reviewing ProClarity's obviousness motion as to each combination of prior art.

The court analyzes these claims in light of ProClarity's expert's testimony implicitly opining that the combination of the ODBC Driver, Access, Upsizing Wizard, and SQL Server is not able to perform all the claims of the Timeline patents. Dr. H.V. Jagadish declared that the combination of prior art offered by ProClarity "constitutes a single entity that anticipates *many* of the claims of the Timeline Patents." Jagadish Decl. ¶ 14 (emphasis added). Nowhere does Dr. Jagadish opine that this combination "anticipates or renders obvious" all the claims in the Timeline patents, only "many" of them. *Id.* This testimony appears to weaken significantly ProClarity's motion. Similarly, the court's own analysis of the prior art in comparison to the Timeline patents leads it to

ORDER DENYING SUMMARY JUDGMENT MOTION – 7

the conclusion that the prior art does not render obvious all claims of the Timeline patents.

        i.      ODBC Driver[2]

The ODBC Driver is a "database programming interface from Microsoft that provides a common language for Windows application to access databases on a network." Alan Freedman, *Computer Desktop Encyclopedia*, 9th Ed. 690 (2001). According to ProClarity, sometime in 1992, Microsoft proposed an ODBC Driver that provided a blueprint for the use of drivers that accessed different kinds of data sources in a standard way – a process similar to the one proposed in the Timeline patents. Mot. at 4. In support of its argument, ProClarity relies on the declaration and expert report of Dr. Jagadish, and the Reference Manual for the ODBC Driver ("ODBC Manual"). The court has reviewed the record, and as discussed below, does not find support for ProClarity's argument that the ODBC Drivers meet all, or even most, of the claimed inventions of the Timeline patents.

Dr. Jagadish states that the ODBC Drivers define a "mechanism for creating drivers to provide access to various data sources and also provides particular instances of drivers for specific data sources." Jagadish Decl. ¶ 15. Dr. Jagadish further explains how the ODBC Driver obtains information about a data source's system tables, i.e., provides a list of table names stored on a data source. *Id.* at ¶ 16. Dr. Jagadish does not explain, however, how the ODBC Driver "automatically" obtains information about data structure, nor does he opine that the ODBC Driver creates a new database with a new data

---

[2] A "driver" is a "program routine that links a peripheral device to the operating system. It is written by programmers who understand the detailed knowledge of the device's command language and characteristics. It contains the precise machine language necessary to perform the functions requested by the application." Alan Freedman, *Computer Desktop Encyclopedia*, 9th Ed. 278 (2001).

ORDER DENYING SUMMARY JUDGMENT MOTION – 8

structure. The ODBC Manual likewise fails to explain how the ODBC Driver satisfies these claims of the Timeline patents. According to the ODBC Manual, the ODBC Driver has four components, one of which is a driver. Black Decl. Ex. 4 (ODBC 2.0 Programmer's Reference and SDK Guide) at 5. The driver "[p]rocesses ODBC function calls, submits SQL requests to a specific data source, and returns results to the application. If necessary, the driver modifies an application's request so that the request conforms to syntax supported by the associated [database management system]." *Id.* While the ODBC package includes drivers that can be used to create an ODBC application, each driver is programmed to support only a specific database. *Id.* For example, there is a driver programmed to work with Access, one programmed to work with MS-DOS and other Windows-based formats, one that is programmed to work with Microsoft Excel, and another that supports FoxPro. *Id.* Thus, the ODBC Drivers are not designed to work with different types of source data, but rather, are programmed to work exclusively with one type of data source. The ODBC Driver does not "automatically" obtain information about the data structure of the data source to create a new database. Its purpose appears to be limited to accessing and transferring data from one known data source to a target database.

  ProClarity attempts to get around the claim requirement that the driver obtain information about data structure by pointing out that the ODBC Drivers are able to obtain information about a "data source's system tables." As discussed more fully below, the court does not find that an ODBC Driver's ability to obtain a list of tables meets the claim requirement that the driver obtain information about the data structure. Moreover, nothing in the record suggests that the ODBC Driver *automatically* accesses and/or analyzes the content of a data source to obtain the information about its data structure. What is clear from the record is that using an ODBC Driver to perform this step requires

ORDER DENYING SUMMARY JUDGMENT MOTION – 9

human intervention and therefore does not satisfy the court's construction of "automatically," i.e., without user input or analysis.

ProClarity simply responds by arguing that "automating" what is otherwise a manual process would be obvious and therefore automation cannot provide the basis for patentability. The court disagrees. Although the court recognizes that a patent that merely automates what was once a manual process may be considered obvious, it is convinced that the Timeline patents achieve more than simply automating a manual process. The Timeline patents, at a minimum, reduce the need for substantial human analysis of data.

Finally, ProClarity contends that an ODBC Driver, when combined with Access or its Table Copy program ("TABLCPY"), can automatically obtain information about structure of a data source. Yet, the supporting evidence it provides for this argument is Dr. Jagadish's declaration wherein he opines that the ODBC Driver combined with TBLCPY can automatically "move" the content of a data source from one format to another. Jagadish Decl. ¶ 18. With respect to Access, Dr. Jagadish contends that the ODBC Drivers could determine if the data source was "compatible" with Access, and, if not, Access could convert the data. *Id.* at 19-26. Dr. Jagadish further opines that Access can then "import" the data from the first data source. *Id.* The court does not find that any of these methods for "moving," "converting," or "importing" data satisfies the claim requirement that the driver obtain information about the data structure of the first data source.[3]

---

[3] Moreover, the court notes that nothing in the record supports a finding that the ODBC Driver thereafter creates a database with a data structure that is different from the data source. *See* Klausner Decl., Ex. 1 (Expert Report) at 44.

ORDER DENYING SUMMARY JUDGMENT MOTION – 10

### ii. Access and Upsizing Wizard

The parties do not dispute that Access running alone does not satisfy the claim that it obtains information about the "logical organization" of a data source. The record suggests that Access's main function in this regard is to replicate a single table or spreadsheet from a source. *See* Klausner Decl. ¶ 13. ProClarity contends that by adding the Upsizing Wizard to Access, a user has the capability to access an Access database, determine the structure of that database, and create a new database in SQL Server that has a structure that is based in part on the structure of the Access database. Jagadish Decl. ¶ 30. This, according to ProClarity, meets the claim descriptions in the Timeline patents.

The Upsizing Wizard was an add-in guide to Access and runs only in conjunction with that program. Klausner Decl. ¶ 16. The stated purpose of the Upsizing Wizard is to export data from an Access database to a SQL Server database. *Id.* Upsizing Wizard displays a list of tables from the first data source for the user to select to use in the target database. *Id.* Accordingly, assuming that lists of tables can be considered data structure, information about the data structure of a data source using the Upsizing Wizard required the user to manually determine which tables to use in the new database. *Id.* at ¶ 17. The court is not convinced that providing a list of tables to the user, gives the user information about its data structure.

ProClarity's expert, Dr. Jagadish, acknowledges that a list of tables discloses nothing about the data structure. Jagadish Dep. at 49. Dr. Jagadish testified that table names are not information about structure. *Id.* ("I don't think table names is an example of structure. I think that the name of the table doesn't tell me anything about the structure directly."). Yet, in Dr. Jagadish's expert report filed in this case, he opines that "*based on the court's claim construction order* tables can constitute structure." Jagadish Decl. ¶ 33 (emphasis added). Both Dr. Jagadish and ProClarity read too much into the court's

ORDER DENYING SUMMARY JUDGMENT MOTION – 11

definition of "data structure." During the claim construction process the court construed data structure to mean "the logical organization of data such as table[s], columns, or rows." The qualifying phrase "such as tables, columns, or rows" was not intended to be incorporated as part of the definition of data structure, nor as an exclusive list, but was offered as an illustration of different ways to organize information. The examples could have very easily included the organization of data such as fields, records, spreadsheets, or indexes. The determination of data structure requires an understanding of how the data is organized; that is, the data may be organized in tables, columns, rows, fields, records, or spreadsheets. As the court interprets the Timeline patents, it is the ability of the driver to access a data source and determine how that data is organized that forms a substantial part of the Timeline patents. This is different from a driver that accesses a data source with tables and provides the user with a list of table names.

The combination of Access and Upsizing Wizard does not automatically access the data source to determine its logical organization; it merely pulls the names from the list of tables. The court does not find that Upsizing Wizard's ability to "retrieve a set of tables in the Access database" is sufficient to satisfy the claim that the information regarding the logical organization of the first data source is obtained automatically. The court agrees with Dr. Jagadish's testimony that a list of table names does not tell the user anything about the first data source's logical organization. In the same vein, the court did not find ProClarity's argument at the hearing on this issue to be persuasive. ProClarity's counsel attempted to steer the argument away from Dr. Jagadish's testimony by arguing that a user who views a list of table names, such as "patent attorney," "plumber," and "restaurant," obtains information about the organizational structure of the first data source. Such information may tell the user that the tables are organized alphabetically, but the organizational inference requires human analysis, which is not necessary in the

ORDER DENYING SUMMARY JUDGMENT MOTION – 12

Timeline patents.[4]  *See* Claim 1 of the '511 patent ("obtain first information about the data structure of first data source without the need for human analysis").  Thus, the court does not find that the Timeline patents are obvious in light of Access and Upsizing Wizard.

    iii. SQL Server 6.0

  ProClarity also relies on SQL Server 6.0 for its argument on obviousness.  ProClarity contends that SQL Server 6.0 can automatically obtain information about the data structure of a data source through its Transfer Manager.  The Transfer Manager can "connect" to SQL Server 4.2 and obtain information about the tables, columns, and rows in SQL Server 4.2.  *See* Jagadish Decl. ¶ 48.  Again, the court is not persuaded that "transferring" data from one data source to another is the same as automatically obtaining information about a data sources's structure to create a new database.  Therefore, the court does not find that this prior art makes the Timeline patents obvious.  As further explained by Timeline's expert, the Transfer Manager allows the user to replicate a SQL 4.2 database in a SQL 6.0 database by changing its format.  Klausner Decl. ¶ 24-25.  Nothing in the record supports a finding that Transfer Manager transfers information about data structure or that it *automatically* obtains information from the first data source to create a new database.  Finally, the user's guide or Administrator's Companion to SQL Server 6.0 makes clear that the "new" database or "destination database" must already exist.  *See* Klausner Decl. ¶ 24; Ex. 3 ("Before using this tool to transfer data, you must create the destination database and it must be large enough to contain all objects and data that you will transfer.  If you are planning to include segments in your transfer, you must

---

[4] According to the manual for the Upsizing Tool, a user must select the Access database table they want to export to SQL Server.  Indeed, "[i]t's very important to choose the tables you export carefully as this choice will have a significant impact on the performance of your application."  *See* Jagadish Decl. ¶ 32 (quoting the Upsizing Tools manual).

ORDER DENYING SUMMARY JUDGMENT MOTION – 13

also create the segments in the destination database, and there must be sufficient space on the segment(s) to accommodate the tables you will be transferring."). The Timeline patents teach that the new database is created by the process; the database did not exist before the process was commenced. This is contrary to the stated function of the Transfer Manager and SQL Server.

The prior art did not perform the essential features of the Timeline patents. That is, the prior art did not pull information about the data structure of the first data source, nor did it define a new database with a different data structure using this information. Moreover, the prior art not only failed to perform these functions, but also failed to do so automatically or without user input and analysis. The court finds that the differences between the prior art and Timeline's patents are too great to support ProClarity's argument that the patents-in-suit were obvious.

### 3.     Level of Ordinary Skill In the Pertinent Art

ProClarity posits that the appropriate level of experience necessary to be considered skilled in the art is a person with a Bachelor's degree and "several" years of software development experience in the field or its equivalent. *See* Jagadish Decl. ¶ 4. ProClarity erroneously states in its motion that the parties do not dispute this element of the *Graham* test. Timeline contends that the level of experience is a genuine "material dispute of fact." Resp. at 10. Timeline grounds its position on the fact that its expert put the level of experience at "one to two years," and therefore ProClarity's use of "several" is an unfair "inflation" of the level of experience and makes it more likely that a person would find the patents obvious. *Id.* Timeline directs the court to the American Heritage Dictionary's definition of "several," which defines several as constituting "more than two or three but not many." *Id.* While this may create a dispute, i.e., is "one to two" the same

ORDER DENYING SUMMARY JUDGMENT MOTION – 14

as "several," the court finds this distinction to be neither genuine nor material. Accordingly, the court finds the level of experience to be between two and three years.

### 4. Secondary Considerations

As stated above, secondary considerations such as commercial success, long felt but unsolved needs, failure of others, etc., may be employed to determine the circumstances surrounding the origin of the subject matter sought to be patented. *Graham*, 383 U.S. at 17-18. Here, the secondary considerations weigh in favor of validity.

The parties do not dispute that the technology described in the Timeline patents is embodied in a Microsoft software product known as the Small Business Financial Manager ("SBFM"). Mot. at 2; Resp. at 3. The history behind this product's development is instructive on the issue of long felt need. In 1995, Microsoft hired Timeline to assist in the development of the SBFM software. *Id.* Microsoft needed a software program that would automate the function of importing data stored in proprietary formats of accounting software. *Id.* It was an important aspect of the project that the software program permit the importation of data automatically so that users would not have to manually transfer data, which takes a substantial amount of human labor. Short Decl., Ex. 3 (Levin Dep.) at 94.

Microsoft's Program Manager for the SBFM program, John Misko, testified in this case that sometime in 1995, he began looking for an independent software vendor that could write code for a program that would "as seamlessly as possible" transfer data from accounting software into Microsoft's Excel program. Misko Dep. at 70. Microsoft did not have the "resources" to develop the product without the assistance of an outside vendor. *Id.* Mr. Misko contacted Timeline to inquire whether it could develop such a program. *Id.* Mr. Misko was "thrilled" to have found Timeline because its employees

ORDER DENYING SUMMARY JUDGMENT MOTION – 15

could write software and they understood how the accounting field worked. *Id.* at 70. Indeed, when Mr. Misko attended the first demonstration meeting with Timeline's developers, wherein they demonstrated how Timeline's product could import accounting data to Excel from an ASCII or text file, he felt very fortunate to have found someone who could develop this software. *Id.* Based on this testimony, the court finds that at the time the Timeline invention was patented, there existed a long felt need for this type of software capability.

The court also finds the testimony of Marjorie Templeton persuasive in analyzing secondary considerations. Ms. Templeton is, according to Timeline, a "neutral" third party witness in this matter. She has been in the software development business since 1963, and even formed her own company that attempts to solve the same problem as the Timeline patents (i.e., the ability to access and use information stored in multiple data sources). Short Decl., Ex. 6 (Templeton Dep.) at 9-21. The court is confident that Ms. Templeton qualifies as someone skilled in the pertinent art. Ms. Templeton testified that the '511 patent attempts to perform a function that is "magic." *Id.* In Ms. Templeton's opinion, the '511 patent "would never work," but, if it did work, it would be "quite an invention." *Id.* at 138, 150-51. Despite Ms. Templeton's opinion as to the capability of the Timeline patents, the court finds that her testimony weighs in favor of nonobviousness.

Finally, the court finds the secondary consideration of licensing to weigh in favor of Timeline. The record reveals that Timeline has extensively licensed its patents-in-suit to Microsoft, Hyperion Solutions, Sagent, Broadbase, Oracle, Noetix, and others. Klausner Decl. at 15, *see In re Sernaker*, 702 F.2d 989, 996 (Fed. Cir. 1983) (noting that the extensive licensing of plaintiff's patents can be factored into the court's analysis of secondary considerations).

ORDER DENYING SUMMARY JUDGMENT MOTION – 16

Accordingly, given the fact that Microsoft, the inventor of the prior art at issue, contracted Timeline to invent what it apparently could not do itself, as well as Timeline's extensive licensing thereafter, further convinces the court that the Timeline patents were not obvious when patented in 1998.

## IV.  CONCLUSION

For the foregoing reasons, the court DENIES ProClarity's motion for summary judgment (Dkt. # 301).

Dated this 24th day of September, 2007.

JAMES L. ROBART  
United States District Judge

ORDER DENYING SUMMARY JUDGMENT MOTION – 17